# 14-1520

In the

# United States Court of Appeals
## For the Second Circuit

JOTICA TALWAR,

*Plaintiff-Appellant,*

v.

STATEN ISLAND UNIVERSITY HOSPITAL,
ANTHONY C. FERRERI, HENRY SIMPKINS,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

**EPSTEIN, BECKER & GREEN, P.C.**
*Attorneys for Defendants-Appellees*
250 Park Avenue
New York, New York 10177
(212) 351-4500

*Of Counsel:*
**STEVEN M. SWIRSKY**
**JOHN F. FULLERTON III**

*Appeal Press, LLC* - (914) 761-3600  (212) 267-6602  (16825)

## CORPORATE DISCLOSURE STATEMENT PURSUANT
## TO FEDERAL RULE OF APPELLATE PROCEDURE 26.1

To enable the judges of the Court to evaluate possible disqualification,

Defendant-Appellee Staten Island University Hospital states that it has no parent

company, but it is a member of North Shore / Long Island Jewish Health System.

# TABLE OF CONTENTS

Page(s)

ISSUES PRESENTED FOR REVIEW ................................................................. 1

STATEMENT OF THE CASE .......................................................................... 3

STATEMENT OF UNDISPUTED FACTS ........................................................ 5

SUMMARY OF ARGUMENT ......................................................................... 12

ARGUMENT ................................................................................................... 16

POINT I      STANDARD OF REVIEW ON APPEAL........................................ 16

POINT II     THE DISTRICT COURT CORRECTLY CONCLUDED
THAT DR. TALWAR FAILED TO ESTABLISH A PRIMA
FACIE CASE OF ALIENAGE DISCRIMINATION. ...................... 17

POINT III    THE DISTRICT COURT CORRECTLY FOUND THAT
DR. TALWAR FAILED TO ESTABLISH A PRIMA FACIE
CASE OF NATIONAL ORIGIN DISCRIMINATION. .................. 28

POINT IV   THE DISTRICT COURT CORRECTLY HELD THAT
DR. TALWAR FAILED TO ESTABLISH A
PRIMA FACIE CASE OF RETALIATION. .................................... 33

POINT V    THE DISTRICT COURT CORRECTLY CONCLUDED
THAT  DR. TALWAR FAILED TO ESTABLISH A PRIMA
FACIE CASE OF GENDER-BASED PAY DISCRIMINATION.... 44

     A.    There was No Evidence of Disparate Pay Between
Male and Female Physicians Sufficient to Support
Claims Under the EPA or N.Y. Labor Law. ........................ 45

     B.    The Undisputed Evidence Showed That Dr. Kong's
Starting Salary Was Based on Factors Other than Sex. ...... 47

     C.    There was Neither Evidence of Pay Discrimination,
nor Evidence of Intent to Discriminate, Sufficient
to Withstand Summary Judgment under Title VII. ............. 50

POINT VI   SUMMARY JUDGMENT WAS ALSO APPROPRIATE WITH
RESPECT TO DR. TALWAR'S DISCRIMINATION AND
RETALIATION CLAIMS UNDER STATE AND CITY LAW....... 53

     A.    Procedural Posture.............................................................. 53

B.     Summary Judgment Should Be Affirmed with Respect to the State and City Law Claims. ........................................ 54

CONCLUSION ................................................................................................. 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldrich v. Randolph Cent. Sch. Dist.*,
  963 F.2d 520 (2d Cir. 1992)............................................................... 45

*Beaumont v. Cablevision Sys. Corp.*,
  No. 10-CV-3585, 2012 U.S. Dist. LEXIS 49686
  (E.D.N.Y. Apr. 9, 2012)................................................................... 38-39

*Bennett v Health Mgt. Sys., Inc.*,
  92 A.D.3d 29, 936 N.Y.S.2d 112 (1st Dep't 2011) ........................... 55

*Brown v. City of Oneonta*,
  221 F.3d 329 (2d Cir. 2000)................................................................ 17

*Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co*,
  93 F.3d 1064 (2d Cir. 1996).............................................................. 54

*Chertkova v. Connecticut Gen. Life Ins. Co.*,
  92 F.3d 81 (2d Cir. 1996).................................................................. 29

*Dandamudi v. Tisch*,
  686 F.3d 66 (2d Cir. 2012)................................................................ 20

*Dawson v. County of Westchester*,
  373 F.3d 265 (2d Cir. 2004).............................................................. 16

*Drury v. Waterfront Media, Inc.*,
  No. 05 Civ. 10646, 2007 U.S. Dist. LEXIS 18435
  (S.D.N.Y. Mar. 7, 2007) ................................................................... 48

*EEOC v. White and Son Enters.*,
  881 F.2d 1006 (11th Cir. 1989) ........................................................ 47

*Foster v. Humane Soc'y of Rochester & Monroe Cty., Inc.*,
  724 F. Supp. 2d 382 (W.D.N.Y. 2010)................................................ 37

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.,*
  136 F.3d 276 (2d Cir. 1998)............................................................33-34, 37, 39

*Geller v. North Shore Long Island Jewish Health Sys.,*
  No. 10-CV-0170, 2013 U.S. Dist. LEXIS 135865
  (E.D.N.Y. Sept. 23, 2013)............................................................ 38

*Havey v. Homebound Mortg., Inc.,*
  547 F.3d 158 (2d Cir. 2008)............................................................ 16

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,*
  470 F. Supp. 2d 345 (S.D.N.Y. 2007) ............................................ 34, 39

*Kent v. Papert Cos.,*
  309 A.D.2d 234 (1st Dep't 2003) ................................................ 45

*Lavin-McEleney v. Marist Coll.,*
  239 F.3d 476 (2d Cir. 2001)............................................................ 50

*Leopold v. Baccarat, Inc.,*
  174 F.3d 261 (2d Cir. 1999)............................................................ 55

*Mazzella v. RCA Global Commc'ns, Inc.,*
  642 F. Supp. 1531 (S.D.N.Y. 1986),
  *aff'd mem.*, 814 F.2d 653 (2d Cir. 1987) ....................................47-48

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973)................................................................ 28, 56

*Mihalik – Albunio v. City of N.Y.,*
  16 N.Y.3d 472 (2011) ................................................................ 57

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
  715 F.3d 102 (2d Cir. 2013)........................................................ 55, 57

*Mixon v. Buffalo Med. Grp., P.C.,*
  No. 10 CV-1043A, 2013 U.S. Dist. LEXIS 21889
  (W.D.N.Y. Jan. 28, 2013) ............................................................ 37

*Moccio v. Cornell Univ.,*
  889 F. Supp. 2d 539 (S.D.N.Y. 2012),
  *aff'd by* 526 F. App'x 124 (2d Cir. 2013)...................................... 28

*Ramos v. City of N.Y.*,
No. 96-CV-3787, 1997 U.S. Dist. LEXIS 10538
(S.D.N.Y. July 22, 1997) .................................................................. 37

*Rivera v. Apple Indus. Corp.*,
148 F. Supp. 2d 202 (E.D.N.Y 2001) ............................................ 32

*Sank v. City Univ. of N.Y.*,
No. 10-CV-4975, 2011 U.S. Dist. LEXIS 125016
(S.D.N.Y. Oct. 27, 2011) ................................................................ 38

*Schnabel v. Abramson*,
232 F.3d 83 (2d Cir. 2000) ............................................................ 26

*Shan v. N.Y.C. Dep't of Health & Mental Hygiene*,
No. 05 Civ. 3245, 2007 U.S. Dist. LEXIS 69782
(S.D.N.Y. Sept. 18, 2007), *aff'd*, 316 F. App'x 23 (2d Cir. 2009)............... 38

*Shieldkret v. Park Place Entm't Corp.*,
No. 01 Civ. 5471, 2002 U.S. Dist. LEXIS 1032
(S.D.N.Y. Jan. 22, 2002) ............................................................... 48

*Slattery v. Swiss Reinsurance Am. Corp.*,
248 F.3d 87 (2d Cir. 2001)........................................................ 41, 42

*Smith v. Xerox Corp.*,
196 F.3d 358 (2d Cir. 1999)......................................................... 43

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)....................................................................... 54

*Tomasino v. St. John's Univ.*,
No. 08-CV-2059, 2010 U.S. Dist. LEXIS 99919
(E.D.N.Y. Sept. 23, 2010)......................................................... 33-34

*Vaughn v. City of New York*,
No. 06-CV-6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010)..................... 22

*Wright v. Goord*,
554 F.3d 255 (2d Cir. 2009)......................................................... 16

*Zimmerman v. Assocs. First Capital Corp.*,
251 F.3d 376 (2d Cir. 2001)........................................................ 23

## Rules and Statutes

8 C.F.R. § 214.2(o)(1)(ii)(A) ................................................................. 5

8 C.F.R. § 214.2(o)(16) ....................................................................... 31

28 U.S.C. § 1367(c)(3) ........................................................................ 54

29 U.S.C. 206(d) ................................................................................ 47

42 U.S.C. § 1981 .......................................................................... *passim*

F. R. Civ. P. 60(a) .............................................................................. 54

F. R. Civ. P. 56 .................................................................................. 55

N.Y. Educ. Law § 6524 ................................................................ *passim*

N.Y. Educ. Law § 6805(1)(6) .............................................................. 20

N.Y. Exec. Law. § 296 *et seq.* ............................................................. 4

N.Y. Lab. Law § 194 ..................................................................... 45, 47

N.Y.C. Admin. Code § 8-107(a) .......................................................... 56

## Other Authorities

Merriam Webster Dictionary, located at
    http://www.merriam-webster.com/medlineplus/hematopathology ...................... 5

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court correctly concluded that Appellant failed to establish a *prima facie* case of alienage discrimination under 42 U.S.C. § 1981.

2. Whether the District Court correctly concluded that Appellant failed to establish a *prima facie* case of national origin discrimination under Title VII.

3. Whether the District Court correctly concluded that Appellant failed to establish a *prima facie* case of retaliation under Title VII.

4. Whether, even assuming that Appellant had established a *prima facie* case of alienage or national origin discrimination or retaliation under Section 1981 and/or Title VII, summary judgment was nevertheless warranted because Appellant failed to adduce sufficient evidence that Appellees' legitimate, non-discriminatory and non-retaliatory explanations for their actions were pretext for discrimination and/or retaliation.

5. Whether the District Court correctly concluded that Appellant failed to establish a *prima facie* case of salary discrimination under the Equal Pay Act and New York Labor Law.

6. Whether the District Court correctly concluded that, even assuming Appellant had established a *prima facie* case under the Equal Pay Act or New York Labor Law, summary judgment was nevertheless warranted with because there was no genuine dispute of material fact regarding whether the salary differences at issue were based on "any factor other than sex."

7. Whether the District Court correctly concluded that Appellant failed to establish a *prima facie* case of salary discrimination under Title VII.

8. Whether summary judgment was appropriate on the merits of Appellant's claims of national origin and gender-based salary discrimination and retaliation under the New York State Human Rights Law and New York City Human Rights Law.

## STATEMENT OF THE CASE

Appellee Staten Island University Hospital ("Hospital") is a 714-bed specialized teaching hospital located in Staten Island, New York. Appellee Anthony C. Ferreri is the President and Chief Executive Officer of the Hospital. (A37)[1] Appellee Henry Simpkins ("Dr. Simpkins") has been Chairman of the Pathology Department at the Hospital since December 2006. (A95) Effective June 1, 2007, Appellant, Jotica Talwar ("Dr. Talwar"), who, along with other physicians, had been working at the Hospital through a separate professional corporation, was hired directly by the Hospital as an attending physician in its Pathology Department. (A79) On January 15, 2010, the Hospital gave Dr. Talwar written notice of her termination from employment, effective March 30, 2010. (A91; 447-48) On March 15, 2010, Dr. Talwar resigned from employment. (A91; A450)

On February 2, 2012, Dr. Talwar filed a Complaint in United States District Court for the Eastern District of New York, and subsequently filed an Amended Complaint asserting that she had been discriminated against with respect to her salary and discharged by the Hospital in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206(d), New York Labor Law § 194, the

---

[1] Citations to "A" and "SPA" are to the Joint Appendix and Special Appendix, respectively.

3

New York State Human Rights Law, Exec. Law § 296 *et seq.,* and the Administrative Code of the City of New York, § 8-101 *et seq.* (A35-49) On June 21, 2013, Appellees filed a fully-briefed motion for summary judgment on all claims. (A6) On March 31, 2014, the District Court (Carol Bagley Amon, C.J.) issued its Opinion and Order, granting Appellees' motion for summary judgment in its entirety and dismissing the case, finding that Dr. Talwar failed to establish a *prima facie* case of alienage, national origin or gender-based pay discrimination, or retaliation; that there was insufficient evidence from which a jury could conclude that Dr. Talwar had been discriminated or retaliated against; and that there was no genuine dispute of material fact regarding whether salaries in the Pathology Department at the Hospital had been based on "any factor other than sex." (SPA1-21) The District Court declined to exercise supplemental jurisdiction over Dr. Talwar's claims of national origin and gender discrimination and retaliation under state and city law. (SPA21) Judgment was entered accordingly (SPA22) This appeal followed.

4

## STATEMENT OF UNDISPUTED FACTS

Dr. Talwar, an Indian national, came to the United States for her medical residency in 1992. (A76, 455) She held J-2 and J-1 student visas from 1992 through 1999. (*Id.*) After receiving her medical degree and completing her residency in 1998, Dr. Talwar obtained a fellowship at Temple University Hospital, where Dr. Simpkins was Chairman of the Pathology Department and one of Dr. Talwar's supervisors. (A78, 547) Dr. Talwar completed her fellowship in 1999. (*Id.*) She was subsequently hired by South Shore Pathology, P.C. ("South Shore"), a private professional corporation owned by Dr. Karl Lanks, as a pathologist with a subspecialty in hematopathology.[2] (*Id.*) To be able to stay and work in the U.S., Dr. Talwar obtained an O-1 visa, which is initially granted for a three-year period, and must be renewed annually thereafter. (A76, 455) Dr. Simpkins wrote a letter in support of the original O-1 visa petition filed on her behalf. (A78, 457) Department of Homeland Security, United States Citizenship and Immigration Services ("USCIS") regulations state that to qualify for an O-1 visa, the beneficiary must demonstrate extraordinary ability "by *sustained national or international acclaim*" and must be coming "*temporarily* to the United States to continue work in the area of *extraordinary* ability." 8 C.F.R. § 214.2(o)(1)(ii)(A)

---

[2] Hematopathology is the study of the diseases of the blood and related tissues. (*See* http://www.merriam-webster.com/medlineplus/hematopathology (last accessed Nov. 5, 2014)).

5

(A76, 455; *see* relevant excerpt of regulations attached hereto as Appendix A) (emphasis added). Dr. Talwar admitted that she did not meet that high level of acclaim; that her position at the Hospital did not require a physician of extraordinary ability; that she was not in the U.S. "temporarily;" but, at least prior to 2007, she had not taken any steps to become a permanent resident. (A142-43, 146-47)

When Dr. Talwar was hired by South Shore in 1999, she held a limited medical license rather than a regular New York medical license (an "unlimited license"). (A78, 457) Under New York Education Law § 6524 ("Section 6524"), to obtain an unlimited medical license, a physician must be a U.S. citizen or permanent resident. (*see* Appendix B, attached hereto) In 1999, an alien physician on an O-1 visa could obtain a limited license to practice medicine in New York State for three years, with a maximum extension of up to six additional years, as long as the physician was "actively pursu[ing]" U.S. citizenship or permanent residence. (A77, 204) In Dr. Talwar's situation, to obtain permanent residence in the U.S., she would have had to either return to India for two years, or file for and obtain a discretionary "hardship" waiver of this requirement. (A77, 131, 152)

From Dr. Talwar's date of hire in 1999 through May 2007, South Shore was under contract to provide pathologists to work at the Hospital. (A79, 457) Although Dr. Talwar worked in the Hospital, her salary was determined solely by

6

South Shore, without input from the Hospital. (*Id.*) In December 2006, the Hospital hired Dr. Simpkins as Chair of the Pathology Department, and subsequently terminated its contract with South Shore. (*Id.*) Effective June 1, 2007, the Hospital hired the South Shore pathologists as attending pathologists at salaries commensurate with what they were making at South Shore. (A79, 457) Each received a one-year employment contract, renewable annually, which included the requirement that the pathologist hold "a currently valid and unlimited license and registration to practice medicine in the State of New York." (A79-80, 134, 282-4, 336-38, 362-64, 388-90, 1080-81) The Hospital expected that all attending physicians it employed directly would hold unlimited licenses. (A95) Dr. Talwar did not hold an unlimited license in 2007, so the Hospital permitted her to cross out the "un" in "unlimited" in her employment contract. (A80, 458) The Hospital expected, however, that Dr. Talwar would obtain an unlimited license promptly. (A96)

Because the Hospital felt that the pathology services provided by South Shore had been of poor quality, Dr. Simpkins' mandate when he was hired was to change the Pathology Department, improve the quality of its clinical and anatomical laboratories, which the State had placed on suspension, and to remedy these problems quickly. (A9, 211) To do this, Dr. Simpkins made various changes, including hiring an Associate Chair of Pathology. In addition, because several

attending pathologists resigned not long after being hired directly by the Hospital, he had several vacant positions to fill. (A9) To attract quality candidates, Dr. Simpkins based new hires' salaries on market rates and their credentials, at levels sufficient to recruit them from their previous employment. (A9, 96, 213)

As of 2008, the annual contract salaries of the attending pathologists on staff, who had previously worked for South Shore, included: Dr. Talwar, female – $174,720; Dr. Visitacion Pabicon, female – $189,280; Dr. Kokila Mody, female – $185,640; Dr. Monika Wrzolek, female – $190,575; Dr. Natalya Khilko, female – $120,336; and Dr. Guangqiai Xiao, male – $139,100. (A84) In 2008 and 2009, as Dr. Simpkins remade the Pathology Department and filled critical vacancies, he offered the physicians whom he was recruiting to leave their jobs and join SIUH — male and female — higher salaries (and, in some cases, enhanced job titles) than the salaries being earned by the physicians — male and female — who had been hired many years earlier by Dr. Lanks, the owner of South Shore. (A84, 98)

In January 2008, Dr. Simpkins recruited Dr. Bette Lazzaro, female, as an attending pathologist to perform anatomic and/or clinical pathology at an annual salary of $231,000, and Dr. Lynne Opitz, female, as Associate Chair of the Pathology Department at an annual salary of $281,000. (A84-85, 97, 213, 427) In August 2008, he recruited Dr. Fanyi Kong, male, as an attending pathologist to perform anatomic and/or clinical pathology at an annual salary of $210,000. (A85)

8

In February 2009, he recruited Dr. Sandra Aponte-Cipriani, female, as Chief of Cytopathology at an annual salary of $251,998. (A86)

Immediately prior to being hired by the Hospital, Dr. Kong worked at Lincoln Hospital as a pathologist where his annual salary was $160,000 for a 40-hour workweek performing only clinical work, which would have been the equivalent of $200,000 per year if he had been working 50 hours per week. (A85) At the Hospital, Dr. Kong, like Dr. Talwar, was required to work a 50-hour workweek, with 40 hours per week dedicated to clinical duties and 10 hours per week dedicated to administrative and teaching duties. (A85) When Dr. Kong was hired, the Hospital was in great need of a surgical pathologist, which Dr. Kong was. (A85, 222)

By the summer of 2008, Dr. Talwar had been on an O-1 visa for nine years and had done almost nothing to obtain permanent resident status, which she needed to obtain an unlimited license. (A78, 80, 90-91, 148-49, 152, 228) In July 2008, Dr. Talwar informed Dr. Simpkins and Dr. Opitz that she had exhausted her extensions under Section 6524 for a limited medical license and would be unable to continue practicing medicine in New York as of September 30, 2008. (A80-81, 140-41) Fortuitously, Section 6524 was amended that summer, enabling Dr. Talwar to apply for another extension. The incident, however, highlighted the need for Dr. Talwar to obtain an unlimited license; because periodic reapplication for

9

the unlimited license was still required, which could be denied, the Hospital was concerned that this issue could arise again if Dr. Talwar failed to do so. (A77-78, 81-82, 149, 155, 201, 204, 228) Dr. Simpkins specifically instructed Dr. Talwar to make sure that this situation would not occur again in the future, *i.e.*, that Dr. Talwar needed to obtain permanent resident status and an unlimited medical license. (A82, 204) Between August 2008 and July 2009, on more than one occasion, Dr. Talwar discussed the status of her application for permanent residence with Drs. Simpkins and Opitz, and told them that she was taking action to obtain permanent residence. (A81-82,157-58, 175, 204, 207)

Dr. Talwar allegedly learned in January 2009 that Dr. Kong's salary was higher than hers. (A86) Dr. Talwar subsequently told three fellow female pathologists, Drs. Pabicon, Wrzolek, and Mody, what Dr. Kong was earning. (A86) According to Dr. Talwar, in or about January 2009, she and Dr. Pabicon informed Dr. Simpkins that they had learned of Dr. Kong's higher salary and he allegedly responded by telling Dr. Talwar that he would look into it. (A86) They did not discuss the matter further with Dr. Simpkins, and Dr. Talwar did not follow up with him. (A86)

In July 2009, Dr. Talwar received a new employment contract for the period from 2009-2010 (as did the other pathologists) which included the Hospital's standard requirement that she hold an unlimited medical license. (A87, 167, 200,

10

203, 310) Dr. Talwar did not sign this contract. (A87) In or about August 2009, Dr. Talwar and Drs. Pabicon and Mody informed Dr. Simpkins that they wanted higher salary increases than they had been offered in their 2009-2010 contracts. (A87) It is undisputed that Dr. Kong's gender was never mentioned or discussed by Dr. Talwar or any of the other doctors, amongst themselves or, more importantly, with Dr. Simpkins, as the alleged reason for the difference in pay. (A86-88, 97, 100, 102, 162, 169-70, 237, 250) Rather, they were upset that a newly-hired pathologist, who was allegedly less experienced, was making more than they were. (A86-88, 100, 102, 162, 237, 250) The other physicians who met with Dr. Simpkins — one of whom, Dr. Mody, is also Indian — continue to work at the Hospital. (A91)

In September 2009, because Dr. Talwar had procrastinated for so long, having failed to show the Hospital that she had taken any concrete actions toward obtaining an unlimited medical license, the Hospital issued Dr. Talwar a revised 2009-2010 contract that included a provision requiring her to obtain an unlimited license by December 31, 2009, and granted the Hospital the right to terminate her employment if she failed to do so. (A88-89, 173, 203, 217, 219-20, 228, 324) The Hospital did this because it could not risk losing a pathologist on short notice, as had almost occurred in 2008, and could occur again if an extension of her license were denied, and because it could take up to six months or more to recruit a

suitable replacement. (A90, 176-77, 268-70) In addition, after submitting another letter on behalf of her O-1 visa in July 2009 (long after the alleged January 2009 meeting), Dr. Simpkins was no longer comfortable sponsoring Dr. Talwar's O-1 visa going forward, which was the basis on which she was permitted to have the unlimited license, because (i) she did not truly meet the qualifications for that visa, and (ii) it was not "critical" or "essential" to the Hospital that Dr. Talwar, in particular, as opposed to another qualified hematopathologist, render services to the Hospital. (A77, 82-83, 96, 149, 193, 201, 232, 260-62) Dr. Talwar failed to obtain an unlimited medical license by December 31, 2009. (A90-91, 148-49) Indeed, she waited until December 31, 2009 before having her husband file the first (of several) necessary documents to begin the process of applying for permanent residence; but she still had not yet applied for the hardship waiver, without which she would have had to return to India for two years. (A90, 148-49) In January 2010, the Hospital notified Dr. Talwar that her employment was terminated effective March 31, 2010. (A447-48) On March 15, 2010, Dr. Talwar resigned. (A91, 221, 450)

## SUMMARY OF ARGUMENT

The District Court correctly applied the law to the undisputed facts in this case, drawing all reasonable inferences in Dr. Talwar's favor, and properly granted summary judgment in favor of Appellees. Because the District Court did not err on

the merits of her claims in any of the ways that Dr. Talwar claims, this Court should affirm the decision of the District Court in its entirety.

Dr. Talwar failed to establish a *prima facie* case that her discharge was based on alienage discrimination under Section 1981. Her allegations of alienage discrimination are, in reality, an attack on the New York Education Law itself, which permits only a limited license to physicians who are neither citizens nor permanent residents of the U.S. The fact that the Hospital took actions consistent with this provision to require her to obtain a much-preferred unlimited license cannot, in and of itself, constitute evidence of alienage discrimination. The District Court correctly rejected Dr. Talwar's additional scant evidence of alienage discrimination, and noted that Dr. Talwar herself had alleged (and introduced evidence) that her lack of U.S. citizenship was *not* the reason for the Appellees' actions, but rather, was an alleged "cover" for retaliation for complaining about the difference between her salary and that of Dr. Kong.

Dr. Talwar similarly failed to establish a *prima facie* case of discriminatory termination of employment based on her national origin, as she adduced no evidence whatsoever of animus based on her Indian national origin, but rather, relied solely on evidence that she and one other Indian physician allegedly suffered adverse employment actions, from which, on its own, no inference of discrimination can be drawn. In addition, as with the alienage discrimination claim,

13

she adduced evidence that directly contradicted her national origin discrimination claim by claiming that it was used as an alleged "cover" for retaliation.

Although retaliatory discharge constituted Dr. Talwar's actual theory of the case, she failed to establish a *prima facie* case of retaliation because, based on her own testimony about what she said during critical alleged conversations with Dr. Simpkins, she failed to adduce sufficient evidence that she had engaged in protected activity prior to the pivotal alleged adverse action, *i.e.*, the modification of her unsigned employment contract to include a provision that permitted the Hospital to terminate her employment if she failed to obtain an unlimited license to practice medicine by December 31, 2009. All other instances of alleged protected activity relied upon by Dr. Talwar occurred *after* the modification of her contract, and thus, cannot serve as the basis for her retaliation claim.

Even if Dr. Talwar had established a *prima facie* case of alienage or national origin discrimination or retaliation, she fell woefully short of demonstrating that the Appellees' legitimate, non-discriminatory and non-retaliatory reasons for requiring her to obtain n unlimited license was, in fact, pretext for discrimination or retaliation. The undisputed factual evidence undermined and proved incorrect each of her challenges to Appellees' explanation. In any event, the District Court correctly observed that that, even if she had demonstrated that the Hospital decided to terminate her employment for reasons other than those asserted (which the

Hospital denies), that showing, on its own, is insufficient to create a *prima facie* case of discrimination (SPA14) – or retaliation.

Dr. Talwar failed to establish a *prima facie* violation of the Equal Pay Act and New York Labor Law because the undisputed record is bereft of evidence that male attending physicians in the Pathology Department were paid more than female attending physicians. The District Court correctly rejected Dr. Talwar's attempt to pick and choose her comparators, focusing almost exclusively on Dr. Kong and ignoring higher paid women and lower paid men. Dr. Talwar cannot escape the fact that a female attending physician, Dr. Lazzaro, who was hired by Dr. Simpkins in 2008, the same year that he hired Dr. Kong, was hired at a salary $21,000 higher than Dr. Kong's. In addition, even if she had demonstrated the existence of a difference in pay between male and female physicians, Appellees established that Dr. Kong was paid more based on reasons other than sex: (i) he was offered a salary sufficiently higher than what he was making to recruit him away from another hospital; and (ii) Dr. Kong's and Dr. Talwar's salary trajectories were established by two different supervisors nine years apart, when market conditions, and conditions within the Pathology Department, were different. For these same reasons, Dr. Talwar could not show any intent by Appellees to use gender as a basis for setting salaries, and thus, failed to establish a *prima facie* case of salary discrimination under Title VII.

Finally, Appellees agree that the District Court should not have dismissed the national origin, intentional salary discrimination and retaliation claims under state and city law by declining to exercise supplemental jurisdiction. Federal diversity jurisdiction was undisputed. Based on the undisputed record developed below and arguments set forth herein, this Court should, on this alternative ground, affirm the District Court in favor of Appellees on the merits of these claims.

## ARGUMENT

### POINT I

### STANDARD OF REVIEW ON APPEAL

This Court's standard of review of the District Court's grant of summary judgment is *de novo. Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). To avoid summary judgment, however, Dr. Talwar was obligated to do more than rely on conclusory allegations, conjecture and speculation, but rather, proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)) (internal citations omitted). If Dr. Talwar cannot point to more than "a 'scintilla' of [supporting] evidence" to defeat summary judgment, the District Court's decision should be affirmed. *See Havey v. Homebound Mortg., Inc.,* 547 F.3d 158, 163 (2d Cir. 2008) (quoting *Anderson,* 477 U.S. at 252).

## POINT II

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT DR. TALWAR FAILED TO ESTABLISH A PRIMA FACIE CASE OF ALIENAGE DISCRIMINATION.

The District Court correctly concluded that Dr. Talwar's claim of alienage discrimination under Section 1981 fails as a matter of law because she could not establish a *prima facie* case. (SPA11) To establish a *prima facie* claim of alienage discrimination, Dr. Talwar was obligated to adduce evidence: (1) that she is a member of a racial minority (which includes alienage, but not national origin); (2) intent to discriminate on the basis of alienage; and (3) "discrimination concerning one of the statute's enumerated activities." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) (citation omitted). The District Court recognized that "discrimination on the basis of a person's status as an immigrant to the United States is not alienage discrimination unless it is also motivated by the lack of U.S. citizenship." (SPA9-10, quoting *Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010)). Because Dr. Talwar could not adduce evidence of such motivation, she failed to establish a *prima facie* case.

Dr. Talwar argues that she met the critical second element of the *prima facie* case – intent to discriminate – solely because the Hospital referred to the her "lack of permanent licensure" in its January 15, 2010 notice of termination of her employment. (Brief of Plaintiff-Appellant ("Br.") 22) Permanent licensure under

17

New York Education Law Section 6524 requires that the physician be a U.S. citizen or permanent resident, which she was not at the time. Thus, she claims that "the real issue concerns the propriety of allowing an employer to force a non-citizen to change her status in any way." (Br. 24). Accordingly, she is challenging the provisions of Section 6524 *itself*, rather than identifying any actual evidence that the Hospital's decision to require her to obtain an unlimited license under Section 6524 – which continues to apply to physicians who wish to practice medicine in New York – was discriminatory based on her citizenship. This lawsuit is an entirely inappropriate vehicle for that challenge.

Dr. Talwar cannot establish that the mere fact that the Hospital wanted her to obtain an unlimited license is *de facto* evidence of discriminatory intent because there are practical, completely non-discriminatory reasons that a Hospital would prefer that its attending physicians hold an unlimited license. In 2009, and to this day, Section 6524 provides in relevant part:

> To qualify for a license as a physician, an applicant shall fulfill the following requirements: . . . (6) Citizenship or immigration status: be a United States citizen or an alien lawfully admitted for permanent residence in the United States; provided, however, that the board of regents may grant a three year waiver for an alien physician to practice in an area which has been designated by the department as medically underserved, except that the board of regents may grant an additional extension not to exceed six years to an alien physician to enable him or her to secure citizenship or permanent resident status, provided such status is being actively pursued; *and*

18

> *provided further that the board of regents may grant an additional three year waiver, and at its expiration, an extension for a period not to exceed six additional years,* for the holder of an H-1b visa, an O-1 visa, or an equivalent or successor visa thereto.

(Appendix B). The italicized clause was added in 2008.

Thus, on the face of the statute, there are several restrictions associated with the limited license held by a physician who has not yet become a U.S. citizen or permanent resident: (i) it is only valid in areas designated as medically underserved; (ii) it is subject to discretionary periodic extensions by the board of regents; (iii) the allowable extensions only apply for as long as the physician holds a either an H-1b or O-1 visa (or equivalent / successor visa); and (iv) the physician must be "actively" pursuing citizenship or permanent residence. In light of these restrictions, it is neither surprising nor discriminatory for a hospital to prefer that its attending physicians hold unlimited licenses under Section 6524.

Indeed, Dr. Talwar's situation highlighted the practical shortcomings of the limited license. First, in 2008, Dr. Talwar had nearly exhausted the nine years permitted by the statute then in effect and, absent a fortuitously timed legislative amendment, would have lost her license due to her own inaction. Second, Dr. Talwar's O-1 visa had to be renewed on an annual basis with sponsorship by the Hospital, which the Hospital was no longer comfortable providing because it required certification of qualifications that she has admitted she did not have.

19

(A142-44; Appendix A) Third, Dr. Talwar cannot refute the Hospital's serious concerns that she was, in fact, doing very little, if anything, to "actively" pursue citizenship or permanent residence as required by the statute. (A158, 204, 228) Fourth, the "medically underserved" designation by the state is not necessarily permanent; it could change at some point, in which case, *none* of the physicians on limited licenses would be permitted to continue working for the Hospital. Thus, it was not inherently discriminatory for the Hospital to require her to obtain an unlimited license.

Dr. Talwar's reliance on *Dandamudi v. Tisch*, 686 F.3d 66, 73 (2d Cir. 2012), is, as the District Court correctly found, entirely misplaced. (SPA12 n.1) That case – decided two years *after* the Hospital's allegedly discriminatory actions in this case – involved whether provisions of the Education Law governing limited licenses for pharmacists was constitutional. Whether someone could, today, challenge the constitutionality of Section 6524 based on this Court's decision regarding the constitutionality of New York Education Law § 6805(1)(6) "is not at issue in this case." (SPA12) As the District Court correctly found, the mere fact that the Hospital required Dr. Talwar to obtain an unlimited medical license to conform to an applicable statutory provision (which has not been superceded or abrogated) does not create an inference of alienage discrimination. Indeed, because *Dandamudi* was decided two years *after* Dr. Talwar's termination, the Hospital

20

could not have been guided by its holding even if it had been advised to do so. Rather, the Hospital's actions were guided by a statutory provision that had not, and has not, been declared unconstitutional.

Further, there was nothing inherently discriminatory about the Hospital's decision to give Dr. Talwar a deadline to obtain an unlimited license sooner than the last possible moment that she would have been required to obtain such license under Section 6524. This is particularly true for a physician who had already almost lost her license once because she did not take action in advance of the statutorily prescribed deadline to obtain an unlimited license. She admitted that she could not hold a limited license forever (A204), because the statute itself contains a limitation on the number of available extensions. She knew, having already held a limited license for an inordinately long time, that she needed to take steps to obtain permanent citizenship under the law in effect. (*Id.*)

Because no inference of alienage discrimination can be drawn from either the requirement to obtain an unlimited license or the deadline to do, Dr. Talwar was obligated to adduce some evidence that she was treated differently with regard to her medical license than *similarly-situated* employees *and* that the disparate treatment was based on alienage. The undisputed facts, however, were plainly to the contrary. The Hospital submitted O-1 visa applications on behalf of Dr. Talwar in 2007, 2008, and 2009, and Dr. Simpkins filed letters in support of her O-1 visa

21

applications dating back to 1999. Thus, there was a long history of support for Dr. Talwar's employment at the Hospital regardless of her alienage. Indeed, the Hospital employs many non-U.S. citizens, including several of Dr. Talwar's fellow pathologists, and no one at the Hospital ever told Dr. Talwar that she had to become a U.S. citizen. (A92) She proffered no evidence whatsoever to demonstrate that the Hospital treats U.S. citizens more favorably than non-U.S. citizens. *See Vaughn,* 2010 WL 2076926, at *10.

In addition, the Hospital's application to Dr. Talwar of its standard requirement that all attending physicians obtain an unlimited license does not show intent to discriminate on the basis of alienage. First, because the vast majority of physicians working at the Hospital with limited licenses are relatively short-term residents and interns on H-1B visas, *not attending physicians*, they are not comparable. (A451) Second, all of Dr. Talwar's colleagues who were attending physicians in the Pathology Department held unlimited licenses to practice medicine, and all of their employment contracts required them to hold a "currently valid and unlimited license to practice medicine in the State of New York," regardless of their citizenship status. (A79, 133-34, 201-02, 284, 338, 364, 390) Third, as explained above, the requirement that Dr. Talwar obtain U.S. citizenship *or permanent residence (i.e.,* she did not have to become a U.S. citizen) to obtain

an unlimited medical license was a statutory prerequisite, over which the Hospital had no control.

Dr. Talwar argues as "further supporting her prima facie case" of alienage discrimination that she was replaced by someone outside of her protected class, Dr. Matthew Hurford, who is a U.S. Citizen. (Br. 34-35) This argument is completely meritless. She does not cite any case law to support the claim that a *prima facie* case of *alienage* discrimination can be established just by claiming that she was replaced by a U.S. citizen.[3] Unlike race, gender, or age, a person's citizenship status is not a visually observable characteristic. Unsurprisingly, she cites no evidence that the Hospital knew or inquired as to Dr. Hurford's citizenship status at the time he was interviewed and hired for the position with the Hospital in January 2010 (he executed his employment agreement on January 25, 2010). (A1080-91) The document Dr. Talwar cites to show that Dr. Hurford was a U.S. citizen is a curriculum vitae that he prepared in March 2010, several months *after* he was hired (A1045) Thus, no inference of alienage discrimination can be inferred from the fact that it turned out that she was replaced by a U.S. citizen if she cannot prove, which she has not done, that the Hospital knew that it was replacing her with a U.S. citizen at the time it hired Dr. Hurford. Moreover, Dr. Hurford's contract also required him to "hold a currently valid and *unlimited* license and

---

[3] In the case she cites, *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001), the female plaintiff was replaced by a male.

23

registration to practice medicine in the State of New York." (A1098) (emphasis added), showing again that this was a consistently applied requirement for all attending physicians.

Dr. Talwar's reliance on an email Dr. Simpkins sent to all members of the Pathology Department asking them to provide the kind of proof required on a Form I-9 does not constitute evidence that she was terminated from employment because of her alienage. The email was sent not just to Dr. Talwar, but to *all* members of the department, and thus, she was not singled out in any way. Further, Dr. Simpkins knew full well what Dr. Talwar's immigration status was when he sent the email to the department — he had been writing letters in support of her annual O-1 visa applications for years. The response to the email did not reveal information about her alienage that was previously unknown, and thus, does not support any inference that Dr. Simpkins was attempting to discover her alienage so that he could discriminate against her. Finally, as the District Court correctly concluded, Dr. Talwar's reliance on this email was "entirely undercut" by the fact that it was sent on September 24, 2009, several weeks *after* the modification of her employment contract requiring her to obtain an unlimited license by the end of that year. Thus, that critical decision was made well before the email was distributed. Further, as the District Court noted, the scrutiny of her citizenship status, in Dr. Talwar's own words, was an alleged "cover" for retaliation after she allegedly

complained about salary discrimination, rather than evidence that such change was, in fact, motivated by alienage discrimination. (SPA13)

In this same vein, Dr. Talwar's reliance on the affidavit of Dr. Seema Varma (A487-89) to support her retaliation claim completely undermines her alienage discrimination claim. Dr. Varma is a former attending physician at the Hospital who held an H-1B visa (*i.e.,* similarly lacked U.S. citizenship or permanent residence) and a limited medical license while working at the Hospital, and yet, was never instructed to obtain an unlimited license by a date certain. (A488) Dr. Talwar argues that the fact that the Hospital did not require Dr. Varma to obtain an unlimited medical license shows that the only distinction between them is that Dr. Talwar allegedly complained about gender-based salary discrimination. (Br. 48-49) In other words, alienage is not the basis on which she was treated differently from an allegedly similarly situated person.

Dr. Talwar's arguments miss the mark because she focuses her attack on the Hospital's legitimate non-discriminatory reason for its decision to require her to obtain an unlimited license without first establishing a *prima facie* case of discrimination based on her alienage. (Br. 33-37) Thus, the burden never shifted to the Hospital to offer a legitimate, non-discriminatory reason for its actions, although it did so. That is what the District Court held in its decision, and the point that Dr. Talwar has missed: that even if there were a material issue of disputed fact

as to the reason for the Hospital's decision to require her to obtain an unlimited license (SPA13), that does not entitle Dr. Talwar to a jury trial without *any* evidence from which an inference of discrimination can be drawn in the first place. The District Court did not "ignore[] evidence of pretext." (Br. 33) It made no finding, and did not need to make a finding, regarding whether Dr. Talwar had established that the Hospital's explanation was "pretext" for discrimination, because she adduced no evidence of discrimination, and an alleged showing of pretext is not an *ipso facto* substitute for such evidence. To the contrary, all the undisputed evidence clearly showed that there was no inference that could be drawn that the Hospital discriminated against Dr. Talwar based on her alienage.[4]

In any event, even the alleged evidence of pretext fell well short of yielding anything from which a reasonable jury could conclude that she was discriminated against based on her alienage. Dr. Talwar incorrectly claims that the Hospital's expectation that its attending physicians hold an unlimited license was not true Hospital policy because it was not "written," and that she has established the existence of pretext in the supposed inconsistency in the evidence between Dr.

---

[4] This Court's decision in *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000), does not support Dr. Talwar's argument. (Br. 28). First, the court in *Schnabel* found that the appellant established a *prima facie* of discrimination, which, as explained above, Dr. Talwar failed to do. Second, this Court *affirmed* summary judgment in *Schnabel,* notwithstanding the existence of a *prima facie* case, for the same reason that the Court should do so here: the plaintiff had offered insufficient evidence of discrimination.

Simpkins and Dr. Mark Jarrett, the Hospital's former Chief Medical Officer. (Br. 34) She has not, because she continues to confuse the policies for joining the "medical staff" with privileges to practice medicine at the Hospital with the policies for actually being employed directly by the Hospital. Dr. Jarrett testified about needing "current licensure" in order to become a member of the medical staff and, thus, have privileges to practice medicine at the Hospital (A809, 1035-37) Dr. Simpkins testified that once a doctor became *employed* by the Hospital as an attending physician, the Hospital's expectation was that he or she would hold an unlimited medical license. (A95-96) Indeed, the indisputable reality is that every attending physician's contract for direct employment by the Hospital routinely stated that the physician must have an *unlimited* license as a condition of employment (A282-94, 336-48, 362-74, 388-400, 1080-81), thereby showing, in writing, that this was the Hospital's policy. That the Hospital initially made an exception for Dr. Talwar when it hired her in 2007 does not mean that it was not the Hospital's policy, or that it was discriminatory not to apply that exception to her for as long as she could hold a limited license under Section 6524.

Further, Dr. Talwar's argument that the Hospital started looking for her replacement before the deadline it gave her expired and that this shows pretext for alienage discrimination is also meritless. (Br. 34) She conveniently omits the date of the job advertisement she cites – December 30, 2010. (A1034) In other words,

27

*one day* before the proffered deadline to obtain an unlimited license, having received no indication from Dr. Talwar that she even *intended* to take the necessary steps toward obtaining an unlimited license, the Hospital submitted to an on-line jobs service an advertisement for her position. Starting the hiring process one day before the deadline hardly constitutes proof of pretext in a decision made four months earlier.

**POINT III**

**THE DISTRICT COURT CORRECTLY FOUND THAT
DR. TALWAR FAILED TO ESTABLISH A PRIMA FACIE
CASE OF NATIONAL ORIGIN DISCRIMINATION.**

To establish a *prima facie* case of national origin discrimination, Dr. Talwar was required to adduce evidence to show that her termination occurred under circumstances giving rise to an inference of national origin discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 582 (S.D.N.Y. 2012), *aff'd by* 526 F. App'x 124 (2d Cir. 2013). The District Court correctly held that Dr. Talwar failed to do so. (SPA14)

There is no dispute that Dr. Talwar cannot create an inference of discrimination simply *because* she is Indian. Rather, this Court has noted that circumstances giving rise to an inference of discrimination typically include remarks reflecting a discriminatory animus by decision-makers or preferential

28

treatment being given to employees *outside* the protected class. *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (emphasis added and citations omitted). Here, there were no remarks by a decision-maker, or any other employee of the Hospital, reflecting discriminatory animus against individuals of Indian national origin, nor any other evidence demonstrating that Appellees held discriminatory animus against Indians.

Instead, Dr. Talwar offers just two factual allegations to support her *prima facie* case. The first is that Dr. Mody, who is also Indian and joined Dr. Talwar in the meeting with Dr. Simpkins in August 2009, was also allegedly subjected to an adverse employment action, while Dr. Pabicon, who is Filipina, and Dr. Wrzolek, who is Polish, were not. (Br. 39)

The District Court properly rejected this argument, finding that the revision of Dr. Mody's contract to withdraw a salary increase, without more, was insufficient to establish an inference of discrimination based on national origin. (SPA14) Indeed, Dr. Talwar's argument is tantamount to claiming that an inference of discrimination should be drawn because there are not one, but two, doctors at the Hospital who suffered an adverse employment action – albeit completely different adverse actions – and they were both Indian, as if that were sufficient to state a *prima facie* case. On the contrary, Dr. Talwar conceded, as she must, that the Hospital has employed and continues to employ dozens of interns,

29

residents, and attending physicians of Indian national origin, including Dr. Mody herself, who remains employed at the Hospital and reports to Dr. Simpkins to this day. (*See* SPA14)

Further, the undisputed evidence is that the decision not to increase Dr. Mody's salary in her 2009-2010 employment agreement was based on circumstances that were discussed with Dr. Mody well in advance of the meeting with Dr. Simpkins. Dr. Mody did not receive a raise in her 2009-2010 agreement because of her performance and tardiness, a decision that had been made prior to the end of the academic year (*i.e.,* June 2009), and *before* the alleged August 2009 meeting. (A838) Moreover, there is no evidence that Dr. Mody herself attributed any national origin animus to this decision.

Dr. Talwar's second argument – that the Hospital "demanded proof of Dr. Talwar's fare to India" after she resigned (Br. 40) – misrepresents the record and is easily dispelled. On March 16, 2010, after receiving notice through her attorney that Dr. Talwar had chosen to resign prior to the March 30, 2010 termination date (A450), the Hospital's General Counsel responded to Dr. Talwar's attorney, rejecting his allegations of discrimination and retaliation, and concluding his letter by stating, "[f]inally, as required by law, we will pay Dr. Talwar's fare to India. Please provide proof that her ticket has been purchased and paid for." (A600) Even if the Hospital had not been obligated to make such an offer, the letter itself,

between attorneys for the parties months after the operative events has occurred, cannot constitute evidence that Dr. Simpkins acted with discriminatory animus based on national origin when he requested the modification to Dr. Talwar's employment agreement over six months earlier. (*See* SPA14-15)

In any event, such an offer was compelled by law. If employment is terminated for an employee in the O visa category, for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable costs of return transportation for the foreign national employee to the last place of residence prior to his or her entry into the United States – *i.e.,* India in Dr. Talwar's case. *See* 8 C.F.R. § 214.2(o)(16) (Appendix A). It is clear that all the General Counsel was doing was offering to make that reimbursement – as the District Court correctly concluded. (*See* SPA15)

Dr. Talwar's long history of a positive professional relationship with Dr. Simpkins, dating back to 1998 when she was a fellow at Temple under his supervision, further undermines Dr. Talwar's claim that Dr. Simpkins harbored discriminatory animus against her because she is Indian. Dr. Simpkins wrote a letter in support of Dr. Talwar's her O-1 visa application in 1999 so that she could remain in the United States and work at South Shore, and he maintained communication with her between 1999 and 2006 by co-authoring an article with

31

her. She conceded that she and Dr. Simpkins had "mutual respect for each other" (A80) and, as with her citizenship, there is no evidence that he would "suddenly develop a dislike" for her because she was Indian. (*Cf.* SPA13) *See Rivera v. Apple Indus. Corp.*, 148 F. Supp. 2d 202, 216 (E.D.N.Y 2001) (summary judgment granted where plaintiff's discrimination claims were undercut by the facts that he and one of his supervisors previously worked together at a prior employer, had a good working relationship, and his supervisor was the one who had recommended he be hired). Dr. Talwar offers no explanation how or why Dr. Simpkins would harbor discriminatory feelings against her and Dr. Mody because of their Indian national origin but not against Drs. Pabicon and Wrzolek for their Filipina and Polish backgrounds, after all four female physicians allegedly protested about gender-based pay discrimination.

Finally, as with her alienage discrimination claim, Dr. Talwar's submission of an affidavit from Dr. Varma, an allegedly similarly-situated attending physician of *Indian national origin* who was *not* given a deadline to obtain an unlimited medical license because she did not complain of gender discrimination (Br. 48-49), simply *proves* that Dr. Talwar was not treated differently than other attending physicians based on her Indian national origin. Because Dr. Talwar could not establish that the alleged adverse actions occurred under circumstances giving rise

32

to an inference of national origin discrimination, the District Court correctly concluded that she could not satisfy her *prima facie* burden as a matter of law.

## POINT IV

### THE DISTRICT COURT CORRECTLY HELD THAT DR. TALWAR FAILED TO ESTABLISH A PRIMA FACIE CASE OF RETALIATION.

Dr. Talwar's retaliation claim is predicated on her allegation that she complained to Dr. Simpkins about gender-based wage discrimination and thereafter suffered certain adverse employment actions. (A92, 192) To establish her *prima facie* case, Dr. Talwar was obligated to show that (1) she was engaged in protected activity by opposing unlawful sex-based wage discrimination; (2) Appellees were aware that she was opposing sex-based wage discrimination; (3) she suffered adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (citation omitted). Based on her own testimony, the District Court correctly concluded that Dr. Talwar failed to satisfy the first or second elements; thus, also could not establish the fourth element.

Dr. Talwar's alleged complaints to Dr. Simpkins had to be reasonably specific so as to put him and the Hospital on notice that she was opposing an unlawful practice. *Galdieri-Ambrosini*, 136 F.3d at 280-81, 290-92; *Tomasino v. St. John's Univ.*, No. 08-CV-2059, 2010 U.S. Dist. LEXIS 99919, at *31

(E.D.N.Y. Sept. 23, 2010) ("[A] complaint is not protected activity unless it puts the employer on notice that the employee is protesting unlawful discrimination."). "[A]mbiguous complaints that do not make the employer aware of allegedly discriminatory misconduct do not constitute protected activity" for purposes of establishing a retaliation claim. *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citing *Sales v. YM & YMHA of Washington Heights and Inwood*, Nos. 00 Civ. 8641, 01 Civ. 1796, 2003 U.S. Dist. LEXIS 839, at *22 (S.D.N.Y. Jan. 21, 2003) (complaints to an employer unaware of the racial undertones of term used by employee's supervisor were not protected activity)).

Here, Dr. Talwar's claim falls short because she never told Dr. Simpkins that she believed Dr. Kong was being paid more than her *because he was a male and she was a female*. She simply never raised gender as an issue at all. Rather, she argues that she "firmly believed" that gender was a motivating factor (Br. 44), which is irrelevant if she did not, in sufficient terms as a matter of law, convey that belief to Dr. Simpkins before he took the allegedly adverse employment action of having her employment contract modified. *Galdieri-Ambrosini*, 136 F.3d at 280-81, 290-92 (plaintiff's complaints about assignment of gender-stereotypical duties did not support a claim of retaliation because she never specifically stated that she was assigned these tasks "because she was a woman.").

34

The record is entirely undisputed – indeed, Dr. Talwar emphasizes the same words in her brief (Br. 44) – that, at most, she told Dr. Simpkins, "[i]t's not fair" that Dr. Kong was being paid more because, in her opinion, he was less experienced and she had worked at the Hospital longer. With regard to her first alleged meeting with Dr. Simpkins, in or around January 2009, at which Dr. Pabicon was present, Dr. Talwar testified:

> Q.    You didn't explain why you were upset that Dr. Kong's salary was higher?
>
> A.    We did say that [Dr. Kong is] less qualified and less experienced than us so why is he getting more. We were surprised.
>
> Q.    Did you at that time say to Dr. Simpkins that you felt it was because you and Dr. Pabicon are women and that Dr. Kong is a male?
>
> A.    We did not say anything.

(A86, 162, 170)

With regard to the pathologists' meeting with Dr. Simpkins in or around August 2009, Dr. Talwar testified:

> A:    So I said, you know, 'It's not fair that Dr. Kong, who is less qualified and less experienced than us makes much more than us. And we were hoping that in this new contract we would have got a bigger raise since we brought this to your attention."
>
> ***
>
> Q:    Did you say to Dr. Simpkins at that meeting that you believed that Dr. Long was being paid more than the three of you because you're female and he's a male?

35

A:    It was pretty obvious, and like I said before, we were afraid of him.

Q:    What's obvious?

A:    That Dr. Kong is a male and we were female pathologists.

Q:    Did you say to Dr. Simpkins, "We believe that you are not paying us what you're paying Dr. Kong based on our sex, on our gender?

A:    No, we didn't say it because we were afraid of him.

Q:    So there was never any discussion with Dr. Simpkins about why Dr. Kong might be making more than you?

A:    No.

(A169-70)

The District Court relied on Dr. Talwar's *own* deposition testimony in concluding that she had not sufficiently put Dr. Simpkins on notice that she was reporting gender discrimination. (SPA16) Because Dr. Talwar did not articulate or even suggest that she believed that she was being discriminated against *because of gender*, and, at most, complained about what she perceived as *unfair* salaries based on differences in qualifications and experience between the physicians, Dr. Talwar did not engage in protected activity. "Unfair treatment . . . is not actionable under the civil rights laws and a complaint about it does not constitute protected activity.

36

To be actionable, the unfair treatment must be due to one's membership in a protected class *and the complaint must make that point sufficiently clear.*" *Ramos v. City of N.Y.*, No. 96-CV-3787, 1997 U.S. Dist. LEXIS 10538, at *7 (S.D.N.Y. July 22, 1997) (emphasis added); *Foster v. Humane Soc'y of Rochester & Monroe Cty., Inc.*, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010) (holding that there was "no basis for a retaliation claim" where "plaintiff [did] not allege that she engaged in protected activity. Her own allegations, and the documents she relie[d] on, show[ed] instead that while she did complain about certain problems . . . she did not complain that she was being discriminated against on account of her sex").

It is simply not enough for Dr. Talwar to assert that it was "obvious" that she was opposing allegedly unlawful sex discrimination when she complained that it was "unfair" that Dr. Kong was paid more than she was. *See Galdieri-Ambrosini*, 136 F.3d at 280-81, 290-92 (where plaintiff did not articulate that she believed she was being assigned "gender stereotypical" duties "because she was a woman," the court disagreed that "gender discrimination was implicated" by the nature of plaintiff's complaints); *Mixon v. Buffalo Med. Grp., P.C.*, No. 10 CV-1043A, 2013 U.S. Dist. LEXIS 21889, at *26 (W.D.N.Y. Jan. 28, 2013) (finding that generalized complaints of unequal or unfair treatment, in which plaintiff mentioned neither her age or her race as a factor in the treatment, did not rise to the level of "participat[ing] in a protected activity" sufficient to establish a *prima facie* case of

discrimination); *Geller v. North Shore Long Island Jewish Health Sys.*, No. 10-CV-0170, 2013 U.S. Dist. LEXIS 135865, at *11, 30-31 (E.D.N.Y. Sept. 23, 2013) (holding that female plaintiff's complaint to human resources that her male supervisor's conduct toward her was analogous to that of an abusive spouse did not constitute protected activity because she "did not say anything to suggest that [the supervisor's] comments were sexually motivated"); *Sank v. City Univ. of N.Y.*, No. 10-CV-4975, 2011 U.S. Dist. LEXIS 125016, at *26 (S.D.N.Y. Oct. 27, 2011) (finding that a letter that "complain[ed] about general perceived unfairness" toward the plaintiff was not protected activity because "it says nothing about any form of Title VII-prohibited discrimination."); *Shan v. N.Y.C. Dep't of Health & Mental Hygiene*, No. 05 Civ. 3245, 2007 U.S. Dist. LEXIS 69782, at *16 (S.D.N.Y. Sept. 18, 2007) (finding that a "lengthy e-mail . . . complaining about the unfair treatment . . . and never once suggest[ing] that [the plaintiff's] treatment was caused by her race" was not protected activity), *aff'd*, 316 F. App'x 23 (2d Cir. 2009).[5]

---

[5] Dr. Talwar's reliance on *Beaumont v. Cablevision Sys. Corp.*, No. 10-CV-3585, 2012 U.S. Dist. LEXIS 49686 (E.D.N.Y. Apr. 9, 2012) (Br. 43), is misplaced. The court in *Beaumont* found sufficient evidence of protected activity because, although the plaintiff had never used the word "discrimination," he did make clear to the employer his belief that he had been passed over for promotion in favor of "younger employees," and thus, had raised the protected characteristic of age as the perceived motivation for the employer's decisions. The District Court here acknowledged that there are no "magic words" and that a plaintiff need not expressly use the word "discrimination" to engage in protected activity. (SPA16)

In addition, the District Court correctly found that Dr. Talwar had failed to satisfy the second element of her *prima facie* retaliation claim because Dr. Simpkins could have understood that she was even attempting to complain about gender discrimination prior to the modification of her employment contract. (SPA16) "As to the second element [of Plaintiff's *prima facie* case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [law]." *Galdieri-Ambrosini*, 136 F.3d at 292 ("there was nothing in [plaintiff's] protests that could reasonably have led [her employer] to understand that that was the nature of her objections. . . . Not one of her complaints . . . adverted to gender as a basis for [her] assignments."); *Int'l Healthcare*, 470 F. Supp. 2d at 357 (holding that plaintiff failed to establish a *prima facie* case of retaliation because she "never explicitly raised the issue of gender discrimination when she complained about her work" and her supervisor's comment that "'being the world's highest paid secretary is nothing to be proud of'" did not indicate her complaints were perceived as having a basis in gender discrimination) (citation omitted).

---

Unlike in *Beaumont*, however, Dr. Talwar admitted she never said anything about gender, hers or Dr. Kong's, as the reason for the difference in their salaries. Thus, *Beaumont* is distinguishable.

Neither Dr. Simpkins, nor anyone else at the Hospital, was aware that Dr. Talwar's complaints were aimed at opposing conduct prohibited by law. First, as noted, she never raised Dr. Kong's gender when she met with Dr. Simpkins. Second, Dr. Simpkins knew that Dr. Kong was neither the highest paid individual in the Pathology Department, nor the highest paid Attending Pathologist. Just months before hiring Dr. Kong, Dr. Simpkins had recruited and hired Dr. Lazzaro, female, at a salary of $231,000 annually, which was $21,000 higher than Dr. Kong's salary. Dr. Simpkins had also recruited and hired Dr. Opitz, female, as Associate Chair of the Pathology Department at an annual salary of $281,000 and Dr. Aponte-Cipriani, female, as the Chief of Cytopathology at an annual salary of $251,998. Based on this admirable track record of hiring and paying female physicians well in excess of what he paid Dr. Kong, there was simply no reason for Dr. Simpkins to infer from Dr. Talwar's ambiguous comments that she believed gender played a role in the difference between Dr. Kong's salary and hers.

Contrary to Dr. Talwar's assertion, the District Court did not make, and did not need to make, any "credibility determinations" to reach the conclusion that she had not engaged in protected activity. (Br. 42-44) The District Court noted, merely as support for its conclusion, that none of the other female physicians believed that Dr. Talwar was complaining about gender discrimination. (SPA16) Significantly, Drs. Mody, Pabicon, and Wrzolek testified that the pathologists were upset

because they believed Dr. Kong was less experienced than they were and they had been working at the Hospital longer. (A87, 100, 102, 162, 169, 237, 243, 250) The pathologists never discussed, amongst themselves, or more importantly, with Dr. Simpkins or anyone else in the Hospital's administration, that they believed Dr. Kong's *gender* was the basis for his higher salary. Dr. Talwar did not testify otherwise, and thus, the District Court did not make any "credibility determinations" as between Dr. Talwar and the other three female physicians. It simply pointed to additional, undisputed evidence that gender discrimination was never raised as an issue to Dr. Simpkins or among the physicians themselves.

Because Dr. Talwar did not engage in protected activity prior to the September 3, 2009 change in her contract, she cannot use the temporal proximity between the August 2009 meeting and the change in her contract as evidence of retaliation. It is beyond cavil that the protected activity must precede the commencement of an adverse action to establish a *prima facie* case of retaliation based on temporal proximity. *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001) (rejecting retaliation claim because adverse action began before the protected activity).

In an attempt to circumvent the lack of protected activity during the meeting with Dr. Simpkins in August 2009, Dr. Talwar points to various other alleged examples of protected activity when she raised claims of alienage or salary

41

discrimination. (Br. 44-47) All of these other alleged instances of protected activity
— telling Susan Browning in October 2009, after she received the new contract on
or about September 3, 2009, that she was being discriminated against based on her
visa status (which is not a complaint of gender discrimination in any event); or
telling Margaret DiAlto in January 2010, after she received the letter notifying her
of her termination, that she was a victim of gender discrimination; or the letters to
the Hospital from her lawyer in February and March 2010 — were immaterial to
the retaliation claim. The only relevant adverse action is the change in her
employment agreement on or about September 3, 2009, that included a new
deadline which, according to Dr. Talwar, it was impossible to meet. At that point,
according to Dr. Talwar's own arguments, Dr. Simpkins had already made his
decision to engineer her discharge in retaliation for the August 2009 meeting, and
procured a change in her contract which put in motion the events that resulted in
her termination. Thus, no causality can be inferred from Dr. Talwar's *subsequent*
alleged acts of protected activity once the alleged decision to replace her was
already made. When the adverse action was already ongoing at the time of the
protected activity, or is simply the continuation of an adverse action that was taken
before the protected activity, logic precludes any inference of causation. *See
Slattery,* 248 F.3d at 195; SPA17)

Dr. Talwar argues that she is relying not only upon the temporal proximity between alleged protected activity and the adverse action, but on an allegedly similarly-situated physician, Dr. Varma, who did not complain of gender discrimination and was not given a deadline to obtain an unlimited medical license. (Br. 48-49) This evidence was immaterial because Dr. Talwar failed to establish that she had engaged in protected activity prior to the relevant adverse employment action. In any event, Dr. Varma, however, was *not* similarly-situated to Dr. Talwar for the following undisputed reasons.

First, Dr. Varma worked in a completely different department of the Hospital under different decision makers. (A487) Thus, how she was treated by other decision makers reveals nothing about Dr. Simpkins' motivation, *i.e.*, whether he treated Dr. Talwar differently than other physicians because of her allegedly protected activity. *See Smith v. Xerox Corp.,* 196 F.3d 358, 370-71 (2d Cir. 1999) ("only a comparison between persons evaluated by the same decision maker is probative of discrimination").

Second, Dr. Varma only worked at the Hospital for two years and four months, and was not an attending physician that whole time. (A487) Thus, unlike Dr. Talwar, she had *not* been working at the Hospital for years and years without taking the necessary steps to obtain an unlimited medical license.

43

Third, unlike Dr. Talwar, Dr. Varma had not previously almost lost her license through her own procrastination. This is a critical distinguishing factor. There is no dispute regarding the consternation caused to Drs. Simpkins and Opitz when it was discovered just how close to the deadline Dr. Talwar had come without taking sufficient steps to obtain an unlimited license, nor about the fact that Dr. Talwar and her supervisors had conversations in 2008 – long before any alleged protected activity — about what she was doing to obtain permanent residence. Thus, her alleged evidence of disparate treatment fell well short of the required showing.

## POINT V

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT DR. TALWAR FAILED TO ESTABLISH A PRIMA FACIE CASE OF GENDER-BASED PAY DISCRIMINATION.

The District Court correctly concluded that Dr. Talwar's gender-based discrimination claims failed because she could not establish a *prima facie* case under multiple statutes. (SPA19, 20)

**A.  There was No Evidence of Disparate Pay Between Male and Female Physicians Sufficient to Support Claims Under the EPA or N.Y. Labor Law.**

"In order to prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of wage discrimination by demonstrating that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; (3) the jobs are performed under similar working conditions." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 524 (2d Cir. 1992) (citation omitted). New York Labor Law § 194 is analyzed under the same standards applicable to the EPA. *Kent v. Papert Cos.*, 309 A.D.2d 234, 246 (1st Dep't 2003). Dr. Talwar failed to establish a *prima facie* case because the undisputed evidence does not support the first element of this standard.

Dr. Talwar's entire claim hangs on the fact that Dr. Kong earned more than she did. The District Court correctly held that Dr. Talwar did not establish that "the employer pays different wages to employees of the opposite sex" because all she did was compare herself to this one male physician. As this Court has observed, "the problem with comparing [a female] plaintiff's pay to that of a single male employee is that it may create the impression of an Equal Pay Act violation where no widespread gender discrimination exists." (SPA18, quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 481 (2d Cir. 2001)). Instead, the proper test is to

determine whether Dr. Talwar was paid less than the average wage of all the male attending physicians during the relevant time period. *Id.* When analyzed in this way, the District Court correctly noted that Drs. Petrov and Xiao, male attending physicians who worked in the Department until 2007 and 2008, respectively, earned substantially less than Dr. Talwar did. (SPA19; A273)

Analyzing the subsequent period when Dr. Kong was the only male attending physician, the District Court appropriately rejected Dr. Talwar's attempt to ignore the relevance of the salary of Dr. Lazzaro, another female physician hired by Dr. Simpkins in 2008. The evidence showed that Dr. Lazzaro was an attending physician just as Drs. Talwar and Kong were. (*see* A272-73) Further, Dr. Lazzaro's employment contract states that she was hired to provide "anatomic and/or clinical pathology" (A440), as did Dr. Kong's contract and Dr. Talwar's allegedly discriminatory contract. (A414-24, 308-21) If, as Dr. Talwar claims, she was comparable to Dr. Kong, then they are both equally comparable to Dr. Lazzaro.[6] While Dr. Kong was hired at $210,000, a salary higher than Dr. Talwar's, his salary was $21,000 less than Dr. Lazzaro, who was hired the same year. Because Dr. Lazzaro was the highest paid attending physician in this very

---

[6] Dr. Talwar claims that Dr. Lazzaro's specialty in "transfusion medicine" distinguishes her from Dr. Kong. Yet, all of the attending physicians had at least one specialty. (A272-73) There is no evidence in the record that Dr. Lazzaro's specialty was the reason she was paid more than either Dr. Talwar or Dr. Kong.

small sample (A272-73), Dr. Talwar could not establish that males were paid more than females. (SPA19)

### B. The Undisputed Evidence Showed That Dr. Kong's Starting Salary Was Based on Factors Other than Sex.

The District Court correctly held that, even assuming a *prima facie*, the undisputed evidence showed that Appellees established that the salary difference between Drs. Talwar and Kong was "a differential based on any other factor other than sex." 29 U.S.C. 206(d)(1); NYLL § 194(d).[7] When hiring prospective employees, courts have held that "factor[s] other than sex" include offering a higher salary to recruit from a prior employer and current market rates for the position. *See Mazzella v. RCA Global Commc'ns, Inc.*, 642 F. Supp. 1531 (S.D.N.Y. 1986), *aff'd mem.*, 814 F.2d 653 (2d Cir. 1987) (where male

---

[7] Dr. Talwar implies that the "any factor other than sex" affirmative defense has been waived. (Br. 54) Any such argument should be rejected. Appellees pled in their Answer that all decisions related to Dr. Talwar were based on legitimate, non-discriminatory business reasons, which is broad enough to encompass the EPA's "any factor other than sex" defense. (A63) In any event, the "any factor other than sex" defense was explicitly raised prior to and in Appellees' motion for summary judgment (A65), and Dr. Talwar responded on the merits to the evidence and arguments proffered by Appellees to support the defense, without raising any alleged waiver of the defense as an issue (A70) Thus, Dr. Talwar cannot claim to have been surprised or prejudiced by the fact that Court addressed that issue as an alternative ground for granting summary judgment with respect to the EPA claim. (SPA19-20) The case cited by Dr. Talwar from the Eleventh Circuit, *EEOC v. White and Son Enters.*, 881 F.2d 1006 (11th Cir. 1989), is completely distinguishable, because there, just three days before trial, after the pretrial order had been entered, the defendant moved to amend its answer to raise the affirmative defenses provided by the EPA.

comparator's salary was based on, *inter alia*, approximating the employee's prior salary, including his earned overtime pay in a previous position, to induce him to take the position, and his certain skills and experience that the company believed would be useful in his new position, these factors were not directly or indirectly based on sex"); *Shieldkret v. Park Place Entm't Corp.*, No. 01 Civ. 5471, 2002 U.S. Dist. LEXIS 1032, at *9 (S.D.N.Y. Jan. 22, 2002) ("salary matching – payment of a higher salary to equal or exceed that of a prior job, or of a competing offer – is a reasonable business tactic to lure or retain employees and justify a wage differential.") (citation omitted); *Drury v. Waterfront Media, Inc.*, No. 05 Civ. 10646, 2007 U.S. Dist. LEXIS 18435, at *13-14 (S.D.N.Y. Mar. 7, 2007) (dismissing plaintiff's disparate pay claims where employer "adduced uncontested evidence that [it] wanted to hire someone with [male comparator's] qualifications and that [it] had to pay [him] a higher compensation than plaintiff in order to lure him away from his prior employer.").

When Dr. Kong was hired in 2008, the Hospital had a critical need for a surgical pathologist, because there were several vacancies in the department. Dr. Kong had been licensed and practicing medicine in China prior to coming to the United States, had completed a prestigious fellowship at New York University, was a surgical pathologist, had extensive research experience, and had experience as the director of a laboratory. (A85). At Lincoln Hospital, he was earning

$160,000 annually for a 40-hour week, which is the equivalent of a $200,000 annual salary for the 50-hour week required by the Hospital. Dr. Simpkins offered him $210,000 (an additional $10,000) to recruit him to join the Hospital. Whether or not Dr. Kong actively negotiated the $210,000 the salary he was offered (Br. 51), the undisputed evidence showed that Dr. Simpkins *thought* Dr. Kong was already making $200,000 per year at Lincoln Hospital (A222), and Dr. Kong testified that he *expected* to be offered at least that much. (A106) Dr. Simpkins plainly was not going to offer Dr. Kong *less* money than he was making at Lincoln Hospital to come work for the Hospital *and* take on ten additional extra hours of teaching and administrative duties to do so. (*Id.*)

Further, the Hospital's Pathology Department must be viewed through the lens of the factual circumstances in which it was established. There were two distinct groups in the department: those, like Dr. Talwar, who were originally hired by Dr. Lanks, worked for many years for South Shore, and were hired directly by the Hospital in 2007; and those, like Dr. Kong, who were hired by Dr. Simpkins after 2007. When Dr. Simpkins was hired as Chair of the Pathology Department, he created new positions and had several vacancies for attending pathologists. He recruited and hired both men and women to fill these positions. Dr. Talwar adduced no evidence to dispute that when Dr. Simpkins hired Drs. Opitz (female), Aponte-Cipriani (female), Lazzaro (female), and Kong (male), the market

49

conditions were different than when Dr. Talwar was hired in 1999, and pathologists (regardless of sex) could and did generally require a higher rate to accept employment. Dr. Simpkins paid each of these new hires at the then-current market rate, based on their credentials, at salaries sufficient to recruit them away from their previous employer. As such, Appellees established an additional, indisputable factor other than sex that explains the difference in pay between Drs. Talwar and Kong – the much higher salaries that Dr. Simpkins paid the physicians he hired after he assumed control of the Pathology Department compared to the physicians who were hired by Dr. Lanks years earlier.

### C. There was Neither Evidence of Pay Discrimination, nor Evidence of Intent to Discriminate, Sufficient to Withstand Summary Judgment under Title VII.

Title VII claims are analyzed under the same standards as the EPA. *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476 (2d Cir. 2001). Thus, the District Court correctly granted summary judgment with respect to the Title VII salary-based gender discrimination claim because Dr. Talwar could not show that male and female attending physicians were actually paid unequal wages. (SPA20)

Even if she had done so, Dr. Talwar was required to prove discriminatory intent. *Lavin-McEleney*, 239 F.3d at 483 (Title VII gender-based pay discrimination claims are analyzed similarly to EPA claims, except that to succeed on a Title VII claim, Plaintiff must *additionally* prove discriminatory intent). Dr.

50

Talwar did not proffer one scintilla of evidence to support an allegation that the Appellees *intentionally* discriminated against female pathologists.

Dr. Talwar attempts to prove intentional gender discrimination based solely on the salary and title of male and female physicians, and nothing more. (*See* Br. 40-42) These facts alone are insufficient to support an inference of discriminatory animus against women; indeed, the record is silent as to any facts which would demonstrate that Appellees harbored such a discriminatory animus. To the contrary, the evidence demonstrated that Dr. Simpkins recruited and hired several women, including Dr. Lazzaro as an Attending Pathologist and Drs. Opitz, and Aponte-Cipriani, as Associate Chair of Pathology and Chief of Cytopathology, respectively, prominent roles in the Pathology Department, and paid them salaries much higher than Dr. Kong's.

Dr. Talwar improperly seeks to exclude the undisputed material evidence regarding salaries that do not fit her theory. The District Court appropriately rejected her attempt, for example, to ignore the relevance of the salary of Dr. Lazzaro. (SPA19) Further, the fact that certain other female physicians in the Pathology Department—specifically, Dr. Opitz and Dr. Aponte-Cipriani—were hired into leadership roles by Dr. Simpkins, in addition to their pathology specialties, does not detract from the relevance of their much higher salaries to the

analysis of whether Appellees engaged in *intentional* gender-based salary discrimination, even if they are excluded from the EPA analysis. (*See id.*)

By ignoring Dr. Lazzaro's salary, and the salaries of Drs. Xiao and Petrov, both male attending physicians who made less than Dr. Talwar, but relying on Dr. Villanueva, Dr. Talwar is blatantly cherry-picking comparators without facing the incontrovertible truth: when analyzed as a whole, it is clear that there were attending physicians who made more and less than Drs. Talwar and Kong, both male and female. In addition, Dr. Talwar offers no evidence regarding Dr. Villanueva to explain why she should have received a salary offer identical to Dr. Kong's, but rather, relies solely on the fact that they were hired around the same time. Again, she is relying on nothing more than the fact of different salaries without proffering any evidence whatsoever of intentional discrimination. No reasonable jury could look at the Pathology Department roster from 2007 to 2009 (A272-73) — comprised during that period of 11 women and 4 men, in which three of the four most highly paid physicians were women hired by Dr. Simpkins (Drs. Opitz, Aponte-Cipriani and Lazzaro) — and conclude that there was intentional discrimination on the basis of gender in salary decisions.

Moreover, Dr. Talwar cannot have it both ways, by ignoring the salaries of the higher-paid female physicians in the Department, but relying on Dr. Matthew Hurford's starting salary in 2010 to support her discrimination claim (Br. at 42).

Although Dr. Hurford was hired, in part, to fill Dr. Talwar's role as the Department's hematopathologist (A1080), the undisputed evidence shows that he was hired for a different and significantly greater role than that of either Dr. Talwar, Dr. Kong or Dr. Lazzaro. Unlike these others, Dr. Hurford was hired to perform only 20 hours per week of clinical services (instead of 40), and 30 hours per week of administrative services. (A1082) In addition, Dr. Hurford's contract included a host of additional duties that Dr. Talwar did not have, including, but not limited to, "assisting the Department Chairman with the Operation of the Department," "supervision of professional and technical personnel within the Department," and "preparation of periodic reports to Hospital administration concerning the operation of the Department." (A1080-81) Thus, Dr. Hurford's role was not comparable to Dr. Talwar's.

## POINT VI

### SUMMARY JUDGMENT WAS ALSO APPROPRIATE WITH RESPECT TO DR. TALWAR'S DISCRIMINATION AND RETALIATION CLAIMS UNDER STATE AND CITY LAW.

### A. Procedural Posture

Appellees agree that the District Court should have addressed Dr. Talwar's national origin, salary discrimination and retaliation claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") on the merits of the parties' respective summary judgment

submissions, rather than declining to exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(c)(3). (SPA21; Br. 57-58). The existence of diversity jurisdiction was not disputed. The factual record below was fully developed and Appellees argued to the District Court that summary judgment was appropriate on the merits of both the NYSHRL and NYCHRL. Although Appellees do not agree that *Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co,* 93 F.3d 1064 (2d Cir. 1996) is on point (Br. 58), in the event that this Court chooses to address the merits of these claims, summary judgment should still be affirmed in favor of Appellees.[8]

## B. Summary Judgment Should Be Affirmed with Respect to the State and City Law Claims.

Had the District Court addressed Dr. Talwar's national origin discrimination, salary discrimination and retaliation claims under the NYSHRL on the merits, it would have applied the same burden-shifting standard and substantive legal analysis that it did under Title VII. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 511 (1993) (plaintiff must prove "that the defendant intentionally discriminated against [her]" because of a protected characteristic and "at all times

---

[8] In light of what the parties agreed was an oversight by the District Court, Appellees asked Dr. Talwar to join in a motion under Federal Rule of Civil Procedure 60(a) to provide the District Court with an opportunity to correct the Judgment prior to this appeal. Dr. Talwar refused, and indicated that she would oppose such motion. (*See* Appendix C, attached hereto) Appellees therefore refrained from filing what would have been a disputed motion.

bears the 'ultimate burden of persuasion'") (citations omitted); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) ("New York courts require the same standard or proof for claims brought under the NY[S]HRL as for those brought under Title VII"). Dr. Talwar does not argue otherwise. Thus, for all the reasons set forth above, this Court should affirm on the merits the District Court's decision to grant summary judgment with respect to the NYSHRL claims.

Dr. Talward argues that the NYCHRL claims must be analyzed independently and are interpreted more liberally, and thus, based on the same arguments and evidence she sets forth with respect to the Title VII claim, she is entitled to a jury trial on the NYCHRL claims. (Br. at 58-59) In *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013), this Court cautioned against the suggestion that all NYCHRL claims go to a jury. Regardless of the "liberal" substantive interpretation of the NYCHRL, the summary judgment standards and necessary evidentiary showing required to survive summary judgment in federal court are still governed by Federal Rule 56, and "summary judgment can still be an appropriate mechanism for resolving NYCHRL claims." *Id.* at 111-12.

In *Bennett v Health Mgt. Sys., Inc.*, 92 A.D.3d 29, 41, 936 N.Y.S.2d 112, 123-125 (1st Dep't 2011), for example, cited by this Court in *Mihalik* and relied upon by Dr. Talwar (Br. 59), the appellate court *affirmed* the grant of summary

judgment in favor of defendant under both *McDonnell Douglas* and mixed motive analysis because there simply was not enough evidence that discrimination had been a motivating factor in the decision that affected the plaintiff. Similarly here, because Dr. Talwar was unable to adduce sufficient evidence from which national origin discrimination could be inferred to satisfy even the minimal burden required to establish a *prima facie* case, summary judgment should be affirmed with respect to her national origin discrimination claim under the NYCHRL. The sum total of her evidence of national origin discrimination remains limited to: (i) a wage increase was withdrawn from the contract of Dr. Mody, who is also Indian, after the meeting with Dr. Simpkins to complain about their salaries, and (ii) the Hospital asked for proof of Dr. Talwar's return to India so that it could reimburse those expenses. Both arguments have been addressed and refuted in detail above (*supra* 29-31*)* No reasonable jury could find, even under the NYCHRL, that Dr. Talwar's termination was motivated *in any respect* by her national origin.

With respect to the salary discrimination claim, even if Dr. Talwar had demonstrated the existence of alleged differences with respect to salaries in the Pathology Department — which she failed to do — Dr. Talwar adduced no evidence whatsoever that any such differences were "because of" her gender. *See* Admin. Code § 8-107(a); (*supra* 51-53) Thus, Appellees were entitled to summary judgment with respect to the claim of salary discrimination under the NYCHRL.

Finally, Dr. Talwar did not adduce sufficient evidence that she had engaged in protected activity prior to the modification of her employment agreement even when analyzed under the NYCHRL. In *Mihalik*, 715 F.3d at 112, 115, the Court noted that opposition can include making clear the plaintiff's disapproval of discrimination against another employee by expressing the view that the discriminatory treatment of the victim was "wrong." That does not alter the requirement that it must be clear that what is being opposed is discrimination based on a protected characteristic. There must be evidence of *discrimination* that is identified as "wrong."

The NYCHRL cased cited by this Court in *Mihalik – Albunio v. City of N.Y.*, 16 N.Y.3d 472 (2011) – is factually distinguishable. There, the plaintiff made clear that she was opposing discrimination against another employee based on sexual orientation, where her supervisor had explicitly indicated that the other employee's sexual orientation was precisely the reason he was not hired for a particular job. The state court found that the plaintiff opposed a discriminatory practice because the plaintiff made clear that she thought this treatment of the "victim" was "wrong." *Id.* at 479. That is a far cry from the scenario here, where there were no such background events to provide evidence of discriminatory conduct. Rather, Dr. Talwar cannot dispute that the protected category in question, gender, was simply never raised at all as the supposed reason for Dr. Kong's higher pay. (*supra* 34-38)

Thus, there was insufficient evidence, even under the NYCHRL, from which a reasonable jury could conclude that Dr. Talwar "opposed" a "discriminatory" practice.

## **CONCLUSION**

For all the reasons set forth above, this Court should affirm the District Court's decision granting summary judgment in favor of Appellees on all claims.

Dated:      New York, New York
              November 10, 2014

                        EPSTEIN BECKER & GREEN, P.C.

By:                               
                    Steven M. Swirsky
                    John F. Fullerton III
                250 Park Avenue
                New York, New York 10177
                (212) 351-4500
                Attorneys for Appellees Staten Island
                University Hospital, Anthony C. Ferreri and
                Henry Simpkins

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,681 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-Point Font.

John F. Fullerton III
Attorney for Appellees Staten Island
University Hospital, Anthony C.
Ferreri and Henry Simpkins

Dated: November 10, 2014

# APPENDIX A

 LexisNexis®

FOCUS - 1 of 1 DOCUMENT

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2014, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This document is current through the October 30, 2014 ***
*** issue of the Federal Register ***

TITLE 8 -- ALIENS AND NATIONALITY
CHAPTER I -- DEPARTMENT OF HOMELAND SECURITY (IMMIGRATION AND NATURALIZATION)
SUBCHAPTER B -- IMMIGRATION REGULATIONS
PART 214 -- NONIMMIGRANT CLASSES

**Go to the CFR Archive Directory**

*8 CFR 214.2*

§ 214.2 Special requirements for admission, extension, and maintenance of status.

The general requirements in § 214.1 are modified for the following nonimmigrant classes:

(a) Foreign government officials -- (1) General. The determination by a consular officer prior to admission and the
recognition by the Secretary of State subsequent to admission is evidence of the proper classification of a nonimmigrant
under section 101(a)(15)(A) of the Act. An alien who has a nonimmigrant status under section 101(a)(15)(A)(i) or (ii) of
the Act is to be admitted for the duration of the period for which the alien continues to be recognized by the Secretary of
State as being entitled to that status. An alien defined in section (101)(a)(15)(A)(iii) of the Act is to be admitted for an
initial period of not more than three years, and may be granted extensions of temporary stay in increments of not more
than two years. In addition, the application for extension of temporary stay must be accompanied by a statement signed
by the employing official stating that he/she intends to continue to employ the applicant and describing the type of work
the applicant will perform.

(2) Definition of A-1 or A-2 dependent. For purposes of employment in the United States, the term dependent of
an A-1 or A-2 principal alien, as used in § 214.2(a), means any of the following immediate members of the family ha-
bitually residing in the same household as the principal alien who is an officer or employee assigned to a diplomatic or
consular office in the United States:

(i) Spouse;

(ii) Unmarried children under the age of 21;

(iii) Unmarried sons or daughters under the age of 23 who are in full-time attendance as students at post-secondary
educational institutions;

(iv) Unmarried sons or daughters under the age of 25 who are in full-time attendance as students at post-secondary
educational institutions if a formal bilateral employment agreement permitting their employment in the United States
was signed prior to November 21, 1988, and such bilateral employment agreement does not specify 23 as the maximum
age for employment of such sons and daughters. The Office of Protocol of the Department of State shall maintain a list-
ing of foreign states with which the United States has such bilateral employment agreements;

8 CFR 214.2

(iv) Employment. A border commuter student may not be authorized to accept any employment in connection with his or her M-1 student status, except for practical training as provided in paragraph (m)(14) of this section.

(20) Remittance of the fee. An alien who applies for M-1 or M-3 nonimmigrant status in order to enroll in a program of study at a DHS-approved vocational educational institution is required to pay the SEVIS fee to DHS, pursuant to *8 CFR 214.13*, except as otherwise provided in that section.

(n) Certain parents and children of section 101(a)(27)(I) special immigrants -- (1) Parent of special immigrant. Upon application, a parent of a child accorded special immigrant status under section 101(a)(27)(I)(i) of the Act may be granted status under section 101(a)(15)(N)(i) of the Act as long as the permanent resident child through whom eligibility is derived remains a child as defined in section 101(b)(1) of the Act.

(2) Child of section 101(a)(27)(I) special immigrants and section 101(a)(15)(N)(i) nonimmigrants. Children of parents granted nonimmigrant status under section 101(a)(15)(N)(i) of the Act, or of parents who have been granted special immigrant status under section 101(a)(27)(I) (ii), (iii) or (iv) of the Act may be granted status under section 101(a)(15)(N)(ii) of the Act for such time as each remains a child as defined in section 101(b)(1) of the Act.

(3) Admission and extension of stay. A nonimmigrant granted (N) status shall be admitted for not to exceed three years with extensions in increments up to but not to exceed three years. Status as an (N) nonimmigrant shall terminate on the date the child described in paragraph (n)(1) or (n)(2) of this section no longer qualifies as a child as defined in section 101(b)(1) of the Act.

(4) Employment. A nonimmigrant admitted in or granted (N) status is authorized employment incident to (N) status without restrictions as to location or type of employment.

(o) Aliens of extraordinary ability or achievement -- (1) Classifications -- (i) General. Under section 101(a)(15)(O) of the Act, a qualified alien may be authorized to come to the United States to perform services relating to an event or events if petitioned for by an employer. Under this nonimmigrant category, the alien may be classified under section 101(a)(15)(O)(i) of the Act as an alien who has extraordinary ability in the sciences, arts, education, business, or athletics, or who has a demonstrated record of extraordinary achievement in the motion picture or television industry. Under section 101(a)(15)(O)(ii) of the Act, an alien having a residence in a foreign country which he or she has no intention of abandoning may be classified as an accompanying alien who is coming to assist in the artistic or athletic performance of an alien admitted under section 101(a)(15)(O)(i) of the Act. The spouse or child of an alien described in section 101(a)(15)(O)(i) or (ii) of the Act who is accompanying or following to join the alien is entitled to classification pursuant to section 101(a)(15)(O)(iii) of the Act. These classifications are called the O-1, O-2, and O-3 categories, respectively. The petitioner must file a petition with the Service for a determination of the alien's eligibility for O-1 or O-2 classification before the alien may apply for a visa or seek admission to the United States. This paragraph sets forth the standards and procedures applicable to these classifications.

(ii) Description of classifications -- (A) An O-1 classification applies to:

(1) An individual alien who has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim and who is coming temporarily to the United States to continue work in the area of extraordinary ability; or

(2) An alien who has a demonstrated record of extraordinary achievement in motion picture and/or television productions and who is coming temporarily to the United States to continue work in the area of extraordinary achievement.

(B) An O-2 classification applies to an accompanying alien who is coming temporarily to the United States solely to assist in the artistic or athletic performance by an O-1. The O-2 alien must:

(1) Be an integral part of the actual performances or events and posses critical skills and experience with the O-1 alien that are not of a general nature and which are not possessed by others; or

(2) In the case of a motion picture or television production, have skills and experience with the O-1 alien which are not of a general nature and which are critical, either based on a pre-existing and longstanding working relationship or, if in connection with a specific production only, because significant production (including pre- and post-production) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production.

8 CFR 214.2

(2) Filing of petitions -- (i) General. Except as provided for in paragraph (o)(2)(iv)(A) of this section, a petitioner seeking to classify an alien as an O-1 or O-2 nonimmigrant shall file a petition on Form I-129, Petition for a Nonimmigrant Worker. The petition may not be filed more than one year before the actual need for the alien's services. An O-1 or O-2 petition shall be adjudicated at the appropriate Service Center, even in emergency situations. Only one beneficiary may be included on an O-1 petition. O-2 aliens must be filed for on a separate petition from the O-1 alien. An O-1 or O-2 petition may only be filed by a United States employer, a United States agent, or a foreign employer through a United States agent. For purposes of paragraph (o) of this section, a foreign employer is any employer who is not amenable to service of process in the United States. A foreign employer may not directly petition for an O nonimmigrant alien but instead must use the services of a United States agent to file a petition for an O nonimmigrant alien. A United States agent petitioning on behalf of a foreign employer must be authorized to file the petition, and to accept services of process in the United States in proceedings under section 274A of the Act, on behalf of the foreign employer. An O alien may not petition for himself or herself.

(ii) Evidence required to accompany a petition. Petitions for O aliens shall be accompanied by the following:

(A) The evidence specified in the particular section for the classification;

(B) Copies of any written contracts between the petitioner and the alien beneficiary or, if there is no written contract, a summary of the terms of the oral agreement under which the alien will be employed;

(C) An explanation of the nature of the events or activities, the beginning and ending dates for the events or activities, and a copy of any itinerary for the events or activities; and

(D) A written advisory opinion(s) from the appropriate consulting entity or entities.

(iii) Form of documentation. The evidence submitted with an O petition shall conform to the following:

(A) Affidavits, contracts, awards, and similar documentation must reflect the nature of the alien's achievement and be executed by an officer or responsible person employed by the institution, firm, establishment, or organization where the work was performed.

(B) Affidavits written by present or former employers or recognized experts certifying to the recognition and extraordinary ability, or in the case of a motion picture or television production, the extraordinary achievement of the alien, shall specifically describe the alien's recognition and ability or achievement in factual terms and set forth the expertise of the affiant and the manner in which the affiant acquired such information.

(C) A legible photocopy of a document in support of the petition may be submitted in lieu of the original. However, the original document shall be submitted if requested by the Director.

(iv) Other filing situations -- (A) Services in more than one location. A petition which requires the alien to work in more than one location must include an itinerary with the dates and locations of work.

(B) Services for more than one employer. If the beneficiary will work concurrently for more than one employer within the same time period, each employer must file a separate petition, unless an established agent files the petition.

(C) Change of employer. If an O-1 or O-2 alien in the United States seeks to change employers, the new employer must file a petition and a request to extend the alien's stay. An O-2 alien may change employers only in conjunction with a change of employers by the principal O-1 alien. If the O-1 or O-2 petition was filed by an agent, an amended petition must be filed with evidence relating to the new employer and a request for an extension of stay.

(D) Amended petition. The petitioner shall file an amended petition on Form I-129, with fee, to reflect any material changes in the terms and conditions of employment or the beneficiary's eligibility as specified in the original approved petition. In the case of a petition filed for an artist or entertainer, a petitioner may add additional performances or engagements during the validity period of the petition without filing an amended petition, provided the additional performances or engagements require an alien of O-1 caliber.

(E) Agents as petitioners. A United States agent may file a petition in cases involving workers who are traditionally self-employed or workers who use agents to arrange short-term employment on their behalf with numerous employers, and in cases where a foreign employer authorizes the agent to act in its behalf. A United States agent may be: The actual employer of the beneficiary, the representative of both the employer and the beneficiary; or, a person or entity authorized by the employer to act for, or in place of, the employer as its agent. A petition filed by an agent is subject to the following conditions:

8 CFR 214.2

(1) An agent performing the function of an employer must provide the contractual agreement between the agent and the beneficiary which specifies the wage offered and the other terms and conditions of employment of the beneficiary.

(2) A person or company in business as an agent may file the petition involving multiple employers as the representative of both the employers and the beneficiary, if the supporting documentation includes a complete itinerary of the event or events. The itinerary must specify the dates of each service or engagement, the names and addresses of the actual employers, and the names and addresses of the establishments, venues, or locations where the services will be performed. A contract between the employers and the beneficiary is required. The burden is on the agent to explain the terms and conditions of the employment and to provide any required documentation.

(3) A foreign employer who, through a United States agent, files a petition for an O nonimmigrant alien is responsible for complying with all of the employer sanctions provisions of section 274A of the Act and 8 CFR part 274a.

(F) Multiple beneficiaries. More than one O-2 accompanying alien may be included on a petition if they are assisting the same O-1 alien for the same events or performances, during the same period of time, and in the same location.

(G) Traded professional O-1 athletes. In the case of a professional O-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I-129. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete shall be deemed to be in valid O-1 status, and employment shall continue to be authorized, until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(3) Petition for alien of extraordinary ability or achievement (O-1) -- (i) General. Extraordinary ability in the sciences, arts, education, business, or athletics, or extraordinary achievement in the case of an alien in the motion picture or television industry, must be established for an individual alien. An O-1 petition must be accompanied by evidence that the work which the alien is coming to the United States to continue is in the area of extraordinary ability, and that the alien meets the criteria in paragraph (o)(3)(iii) or (iv) of this section.

(ii) Definitions. As used in this paragraph, the term:

Arts includes any field of creative activity or endeavor such as, but not limited to, fine arts, visual arts, culinary arts, and performing arts. Aliens engaged in the field of arts include not only the principal creators and performers but other essential persons such as, but not limited to, directors, set designers, lighting designers, sound designers, choreographers, choreologists, conductors, orchestrators, coaches, arrangers, musical supervisors, costume designers, makeup artists, flight masters, stage technicians, and animal trainers.

Event means an activity such as, but not limited to, a scientific project, conference, convention, lecture series, tour, exhibit, business project, academic year, or engagement. Such activity may include short vacations, promotional appearances, and stopovers which are incidental and/or related to the event. A group of related activities may also be considered to be an event. In the case of an O-1 athlete, the event could be the alien's contract.

Extraordinary ability in the field of arts means distinction. Distinction means a high level of achievement in the field of arts evidenced by a degree of skill and recognition substantially above that ordinarily encountered to the extent that a person described as prominent is renowned, leading, or well-known in the field of arts.

Extraordinary ability in the field of science, education, business, or athletics means a level of expertise indicating that the person is one of the small percentage who have arisen to the very top of the field of endeavor.

Extraordinary achievement with respect to motion picture and television productions, as commonly defined in the industry, means a very high level of accomplishment in the motion picture or television industry evidenced by a degree of skill and recognition significantly above that ordinarily encountered to the extent that the person is recognized as outstanding, notable, or leading in the motion picture or television field.

Peer group means a group or organization which is comprised of practitioners of the alien's occupation. If there is a collective bargaining representative of an employer's employees in the occupational classification for which the alien is being sought, such a representative may be considered the appropriate peer group for purposes of consultation.

8 CFR 214.2

(iii) *Evidentiary criteria for an O-1 alien of extraordinary ability in the fields of science, education, business, or athletics.* An alien of extraordinary ability in the fields of science, education, business, or athletics must demonstrate sustained national or international acclaim and recognition for achievements in the field of expertise by providing evidence of:

(A) Receipt of a major, internationally recognized award, such as the Nobel Prize; or

(B) At least three of the following forms of documentation:

(1) Documentation of the alien's receipt of nationally or internationally recognized prizes or awards for excellence in the field of endeavor;

(2) Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members, as judged by recognized national or international experts in their disciplines or fields;

(3) Published material in professional or major trade publications or major media about the alien, relating to the alien's work in the field for which classification is sought, which shall include the title, date, and author of such published material, and any necessary translation;

(4) Evidence of the alien's participation on a panel, or individually, as a judge of the work of others in the same or in an allied field of specialization to that for which classification is sought;

(5) Evidence of the alien's original scientific, scholarly, or business-related contributions of major significance in the field;

(6) Evidence of the alien's authorship of scholarly articles in the field, in professional journals, or other major media;

(7) Evidence that the alien has been employed in a critical or essential capacity for organizations and establishments that have a distinguished reputation;

(8) Evidence that the alien has either commanded a high salary or will command a high salary or other remuneration for services, evidenced by contracts or other reliable evidence.

(C) If the criteria in paragraph (o)(3)(iii) of this section do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence in order to establish the beneficiary's eligibility.

(iv) *Evidentiary criteria for an O-1 alien of extraordinary ability in the arts.* To qualify as an alien of extraordinary ability in the field of arts, the alien must be recognized as being prominent in his or her field of endeavor as demonstrated by the following:

(A) Evidence that the alien has been nominated for, or has been the recipient of, significant national or international awards or prizes in the particular field such as an Academy Award, an Emmy, a Grammy, or a Director's Guild Award; or

(B) At least three of the following forms of documentation:

(1) Evidence that the alien has performed, and will perform, services as a lead or starring participant in productions or events which have a distinguished reputation as evidenced by critical reviews, advertisements, publicity releases, publications contracts, or endorsements;

(2) Evidence that the alien has achieved national or international recognition for achievements evidenced by critical reviews or other published materials by or about the individual in major newspapers, trade journals, magazines, or other publications;

(3) Evidence that the alien has performed, and will perform, in a lead, starring, or critical role for organizations and establishments that have a distinguished reputation evidenced by articles in newspapers, trade journals, publications, or testimonials;

(4) Evidence that the alien has a record of major commercial or critically acclaimed successes as evidenced by such indicators as title, rating, standing in the field, box office receipts, motion pictures or television ratings, and other occupational achievements reported in trade journals, major newspapers, or other publications;

8 CFR 214.2

(5) Evidence that the alien has received significant recognition for achievements from organizations, critics, government agencies, or other recognized experts in the field in which the alien is engaged. Such testimonials must be in a form which clearly indicates the author's authority, expertise, and knowledge of the alien's achievements; or

(6) Evidence that the alien has either commanded a high salary or will command a high salary or other substantial remuneration for services in relation to others in the field, as evidenced by contracts or other reliable evidence; or

(C) If the criteria in paragraph (o)(3)(iv) of this section do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence in order to establish the beneficiary's eligibility.

(v) Evidentiary criteria for an alien of extraordinary achievement in the motion picture or television industry. To qualify as an alien of extraordinary achievement in the motion picture or television industry, the alien must be recognized as having a demonstrated record of extraordinary achievement as evidenced by the following:

(A) Evidence that the alien has been nominated for, or has been the recipient of, significant national or international awards or prizes in the particular field such as an Academy Award, an Emmy, a Grammy, or a Director's Guild Award; or

(B) At least three of the following forms of documentation:

(1) Evidence that the alien has performed, and will perform, services as a lead or starring participant in productions or events which have a distinguished reputation as evidenced by critical reviews, advertisements, publicity releases, publications contracts, or endorsements;

(2) Evidence that the alien has achieved national or international recognition for achievements evidenced by critical reviews or other published materials by or about the individual in major newspapers, trade journals, magazines, or other publications;

(3) Evidence that the alien has performed, and will perform, in a lead, starring, or critical role for organizations and establishments that have a distinguished reputation evidenced by articles in newspapers, trade journals, publications, or testimonials;

(4) Evidence that the alien has a record of major commercial or critically acclaimed successes as evidenced by such indicators as title, rating, standing in the field, box office receipts, motion picture or television ratings, and other occupational achievements reported in trade journals, major newspapers, or other publications;

(5) Evidence that the alien has received significant recognition for achievements from organizations, critics, government agencies, or other recognized experts in the field in which the alien is engaged. Such testimonials must be in a form which clearly indicates the author's authority, expertise, and knowledge of the alien's achievements; or

(6) Evidence that the alien has either commanded a high salary or will command a high salary or other substantial remuneration for services in relation to other in the field, as evidenced by contracts or other reliable evidence.

(4) Petition for an O-2 accompanying alien -- (i) General. An O-2 accompanying alien provides essential support to an O-1 artist or athlete. Such aliens may not accompany O-1 aliens in the fields of science, business, or education. Although the O-2 alien must obtain his or her own classification, this classification does not entitle him or her to work separate and apart from the O-1 alien to whom he or she provides support. An O-2 alien must be petitioned for in conjunction with the services of the O-1 alien.

(ii) Evidentiary criteria for qualifying as an O-2 accompanying alien -- (A) Alien accompanying an O-1 artist or athlete of extraordinary ability. To qualify as an O-2 accompanying alien, the alien must be coming to the United States to assist in the performance of the O-1 alien, be an integral part of the actual performance, and have critical skills and experience with the O-1 alien which are not of a general nature and which are not possessed by a U.S. worker.

(B) Alien accompanying an O-1 alien of extraordinary achievement. To qualify as an O-2 alien accompanying and O-1 alien involved in a motion picture or television production, the alien must have skills and experience with the O-1 alien which are not of a general nature and which are critical based on a pre-existing longstanding working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production.

8 CFR 214.2

(C) The evidence shall establish the current essentiality, critical skills, and experience of the O-2 alien with the O-1 alien and that the alien has substantial experience performing the critical skills and essential support services for the O-1 alien. In the case of a specific motion picture or television production, the evidence shall establish that significant production has taken place outside the United States, and will take place inside the United States, and that the continuing participation of the alien is essential to the successful completion of the production.

(5) Consultation -- (i) General. (A) Consultation with an appropriate U.S. peer group (which could include a person or persons with expertise in the field), labor and/or management organization regarding the nature of the work to be done and the alien's qualifications is mandatory before a petition for an O-1 or O-2 classification can be approved.

(B) Except as provided in paragraph (o)(5)(i)(E) of this section, evidence of consultation shall be in the form of a written advisory opinion from a peer group (which could include a person or persons with expertise in the field), labor and/or management organization with expertise in the specific field involved.

(C) Except as provided in paragraph (o)(5)(i)(E) of this section, the petitioner shall obtain a written advisory opinion from a peer group (which could include a person or persons with expertise in the field), labor, and/or management organization with expertise in the specific field involved. The advisory opinion shall be submitted along with the petition when the petition is filed. If the advisory opinion is not favorable to the petitioner, the advisory opinion must set forth a specific statement of facts which supports the conclusion reached in the opinion. Advisory opinions must be submitted in writing and must be signed by an authorized official of the group or organization.

(D) Except as provided in paragraph (o)(5)(i)(E) and (G) of this section, written evidence of consultation shall be included in the record in every approved O petition. Consultations are advisory and are not binding on the Service.

(E) In a case where the alien will be employed in the field of arts, entertainment, or athletics, and the Service has determined that a petition merits expeditious handling, the Service shall contact the appropriate labor and/or management organization and request an advisory opinion if one is not submitted by the petitioner. The labor and/or management organization shall have 24 hours to respond to the Service's request. The Service shall adjudicate the petition after receipt of the response from the consulting organization. The labor and/or management organization shall then furnish the Service with a written advisory opinion within 5 days of the initiating request. If the labor and/or management organization fails to respond within 24 hours, the Service shall render a decision on the petition without the advisory opinion.

(F) In a routine processing case where the petition is accompanied by a written opinion from a peer group, but the peer group is not a labor organization, the Director will forward a copy of the petition and all supporting documentation to the national office of the appropriate labor organization within 5 days of receipt of the petition. If there is a collective bargaining representative of an employer's employees in the occupational classification for which the alien is being sought, that representative shall be the appropriate labor organization for purposes of this section. The labor organization will then have 15 days from receipt of the petition and supporting documents to submit to the Service a written advisory opinion, comment, or letter of no objection. Once the 15-day period has expired, the Director shall adjudicate the petition in no more than 14 days. The Director may shorten this time in his or her discretion for emergency reasons, if no unreasonable burden would be imposed on any participant in the process. If the labor organization does not respond within 15 days, the Director will render a decision on the record without the advisory opinion.

(G) In those cases where it is established by the petitioner that an appropriate peer group, including a labor organization, does not exist, the Service shall render a decision on the evidence of record.

(ii) Consultation requirements for an O-1 alien for extraordinary ability -- (A) Content. Consultation with a peer group in the area of the alien's ability (which may include a labor organization), or a person or persons with expertise in the area of the alien's ability, is required in an O-1 petition for an alien of extraordinary ability. If the advisory opinion is not favorable to the petitioner, the advisory opinion must set forth a specific statement of facts which supports the conclusion reached in the opinion. If the advisory opinion is favorable to the petitioner, it should describe the alien's ability and achievements in the field of endeavor, describe the nature of the duties to be performed, and state whether the position requires the services of an alien of extraordinary ability. A consulting organization may also submit a letter of no objection in lieu of the above if it has no objection to the approval of the petition.

(B) Waiver of consultation of certain aliens of extraordinary ability in the field of arts. Consultation for an alien of extraordinary ability in the field of arts shall be waived by the Director in those instances where the alien seeks readmission to the United States to perform similar services within 2 years of the date of a previous consultation. The director shall, within 5 days of granting the waiver, forward a copy of the petition and supporting documentation to the na-

Case 14-1520, Document 52, 11/13/2014, 1368625, Page 76 of 84

tional office of an appropriate labor organization. Petitioners desiring to avail themselves of the waiver should submit a copy of the prior consultation with the petition and advise the Director of the waiver request.

(iii) Consultation requirements for an O-1 alien of extraordinary achievement. In the case of an alien of extraordinary achievement who will be working on a motion picture or television production, consultation shall be made with the appropriate union representing the alien's occupational peers in the area of the alien's ability. If an advisory opinion is not favorable to the petitioner, the advisory opinion must set forth a specific statement of facts which supports the conclusion reached in the opinion. If the advisory opinion is favorable to the petitioner, the written advisory opinion from the labor and management organizations should describe the alien's achievements in the motion picture or television field and state whether the position requires the services of an alien of extraordinary achievement. If a consulting organization has no objection to the approval of the petition, the organization may submit a letter of no objection in lieu of the above.

(iv) Consultation requirements for an O-2 accompanying alien. Consultation with a labor organization with expertise in the skill area involved is required for an O-2 alien accompanying an O-1 alien of extraordinary ability. In the case of an O-2 alien seeking entry for a motion picture or television production, consultation with a labor organization and a management organization in the area of the alien's ability is required. If an advisory opinion is not favorable to the petitioner, the advisory opinion must set forth a specific statement of facts which supports the conclusion reached in the opinion. If the advisory opinion is favorable to the petitioner, the opinion provided by the labor and/or management organization should describe the alien's essentiality to, and working relationship with, the O-1 artist or athlete and state whether there are available U.S. workers who can perform the support services. If the alien will accompany an O-1 alien involved in a motion picture or television production, the advisory opinion should address the alien's skills and experience wit the O-1 alien and whether the alien has a pre-existing longstanding working relationship with the O-1 alien, or whether significant production will take place in the United States and abroad and if the continuing participation of the alien is essential to the successful completion of the production. A consulting organization may also submit a letter of no objection in lieu of the above if it has no objection to the approval of the petition.

(v) Organizations agreeing to provide advisory opinions. The Service will list in its Operations Instructions for O classification those peer groups, labor organizations, and/or management organizations which have agreed to provide advisory opinions to the Service and/or petitioners. The list will not be an exclusive or exhaustive list. The Service and petitioners may use other sources, such as publications, to identify appropriate peer groups, labor organizations, and management organizations. Additionally, the Service will list in its Operations Instructions those occupations or fields of endeavor where the nonexistence of an appropriate consulting entity has been verified.

(6) Approval and validity of petition -- (1) Approval. The Director shall consider all of the evidence submitted and such other evidence as may be independently required to assist in the adjudication. The Director shall notify the petitioner of the approval of the petition on Form I-797, Notice of Action. The approval notice shall include the alien beneficiary name, the classification, and the petition's period of validity.

(ii) Recording the validity of petitions. Procedures for recording the validity period of petitions are as follows;

(A) If a new O petition is approved before the date the petitioner indicates the services will begin, the approved petition and approval notice shall show the actual dates requested by the petitioner, not to exceed the limit specified by paragraph (o)(6)(iii) of this section or other Service policy.

(B) If a new 0 petition is approved after the date the petitioner indicates the services will begin, the approved petition and approval notice shall generally show a validity period commencing with the date of approval and ending with the date requested by the petitioner, not to exceed the limit specified by paragraph (o)(6)(iii) of this section or other Service policy.

(C) If the period of services requested by the petitioner exceeds the limit specified in paragraph (o)(6)(iii) of this section, the petition shall be approved only up to the limit specified in that paragraph.

(iii) Validity -- (A) O-1 petition. An approved petition for an alien classified under section 101(a)(15)(O)(i) of the Act shall be valid for a period of time determined by the Director to be necessary to accomplish the event or activity, not to exceed 3 years.

(B) O-2 petition. An approved petition for an alien classified under section 101(a)(15)(O)(ii) of the Act shall be valid for a period of time determined to be necessary to assist the O-1 alien to accomplish the event or activity, not to exceed 3 years.

8 CFR 214.2

(iv) Spouse and dependents. The spouse and unmarried minor children of the O-1 or O-2 alien beneficiary are entitled to O-3 nonimmigrant classification, subject to the same period of admission and limitations as the alien beneficiary, if they are accompanying or following to join the alien beneficiary in the United States. Neither the spouse nor a child of the alien beneficiary may accept employment unless he or she has been granted employment authorization.

(7) The petitioner shall be notified of the decision, the reasons for the denial, and the right to appeal the denial under 8 CFR part 103.

(8) Revocation of approval of petition -- (i) General. (A) The petitioner shall immediately notify the Service of any changes in the terms and conditions of employment of a beneficiary which may affect eligibility under section 101(a)(15)(O) of the Act and paragraph (o) of this section. An amended petition should be filed when the petitioner continues to employ the beneficiary. If the petitioner no longer employs the beneficiary, the petitioner shall send a letter explaining the change(s) to the Director who approved the petition.

(B) The Director may revoke a petition at any time, even after the validity of the petition has expired.

(ii) Automatic revocation. The approval of an unexpired petition is automatically revoked if the petitioner, or the named employer in a petition filed by an agent, goes out of business, files a written withdrawal of the petition, or notifies the Service that the beneficiary is no longer employed by the petitioner.

(iii) Revocation on notice -- (A) Grounds for revocation. The Director shall send to the petitioner a notice of intent to revoke the petition in relevant part if is determined that:

(1) The beneficiary is no longer employed by the petitioner in the capacity specified in the petition;

(2) The statement of facts contained in the petition was not true and correct;

(3) The petitioner violated the terms or conditions of the approved petition;

(4) The petitioner violated the requirements of section 101(a)(15)(O) of the Act or paragraph (o) of this section; or

(5) The approval of the petition violated paragraph (o) of this section or involved gross error.

(B) Notice and decision. The notice of intent to revoke shall contain a detailed statement of the grounds for the revocation and the time period allowed for the petitioner's rebuttal. The petitioner may submit evidence in rebuttal within 30 days of the date of the notice. The Director shall consider all relevant evidence presented in deciding whether to revoke the petition.

(9) Appeal of a denial or a revocation of a petition -- (i) Denial. A denied petition may be appealed under 8 CFR part 103.

(ii) Revocation. A petition that has been revoked on notice may be appealed under 8 CFR part 103. Automatic revocations may not be appealed.

(10) Admission. A beneficiary may be admitted to the United States for the validity period of the petition, plus a period of up to 10 days before the validity period begins and 10 days after the validity period ends. The beneficiary may only engage in employment during the validity period of the petition.

(11) Extention of visa petition validity. The petitioner shall file a request to extend the validity of the original petition under section 101(a)(15)(O) of the Act on Form I-129, Petition for a Nonimmigrant Worker, in order to continue or complete the same activities or events specified in the original petition. Supporting documents are not required unless requested by the Director. A petition extension may be filed only if the validity of the original petition has not expired.

(12) Extension of stay -- (i) Extension procedure. The petitioner shall request extension of the alien's stay to continue or complete the same event or activity by filing Form I-129, accompanied by a statement explaining the reasons for the extension. The petitioner must also request a petition extension. The dates of extension shall be the same for the petition and the beneficiary's extension of stay. The alien beneficiary must be physically present in the United States at the time of filing of the extension of stay. Even though the request to extend the petition and the alien's stay are combined on the petition, the Director shall make a separate determination on each. If the alien leaves the United States for business or personal reasons while the extension requests are pending, the petitioner may request the Director to cable notification of approval of the petition extension to the consular office abroad where the alien will apply for a visa.

8 CFR 214.2

(ii) Extension period. An extension of stay may be authorized in increments of up to 1 year for an O-1 or O-2 beneficiary to continue or complete the same event or activity for which he or she was admitted plus an additional 10 days to allow the beneficiary to get his or her personal affairs in order.

(iii) Denial of an extension of stay. The denial of the request for the alien's extension of temporary stay may not be appealed.

(13) Effect of approval of a permanent labor certification or filing of a preference petition on O classification. The approval of a permanent labor certification or the filing of a preference petition for an alien shall not be a basis for denying an O-1 petition, a request to extend such a petition, or the alien's application for admission, change of status, or extension of stay. The alien may legitimately come to the United States for a temporary period as an O-1 nonimmigrant and depart voluntarily at the end of his or her authorized stay and, at the same time, lawfully seek to become a permanent resident of the United States.

(14) Effect of a strike -- (i) If the Secretary of Labor certifies to the Commissioner that a strike or other labor dispute involving a work stoppage of workers is in progress in the occupation at the place where the beneficiary is to be employed, and that the employment of the beneficiary would adversely affect the wages and working conditions of U.S. citizens and lawful resident workers:

(A) A petition to classify an alien as a nonimmigrant as defined in section 101(a)(15)(O) of the Act shall be denied; or

(B) If a petition has been approved, but the alien has not yet entered the United States, or has entered the United States but has not commenced employment, the approval of the petition is automatically suspended, and the application for admission on the basis of the petition shall be denied.

(ii) If there is a strike or other labor dispute involving a work stoppage of workers in progress, but such strike or other labor dispute is not certified under paragraph (o)(14)(i) of this section, the Commissioner shall not deny a petition or suspend an approved petition.

(iii) If the alien has already commenced employment in the United States under an approved petition and is participating in a strike or labor dispute involving a work stoppage of workers, whether or not such strike or other labor dispute has been certified by the Secretary of Labor, the alien shall not be deemed to be failing to maintain his or her status solely on account of past, present, or future participation in a strike or other labor dispute involving a work stoppage of workers but is subject to the following terms and conditions:

(A) The alien shall remain subject to all applicable provisions of the Immigration and Nationality Act and regulations promulgated thereunder in the same manner as are all other O nonimmigrants;

(B) The status and authorized period of stay of such an alien is not modified or extended in any way by virtue of his or her participation in a strike or other labor dispute involving a work stoppage of workers; and

(C) Although participation by an O nonimmigrant alien in a strike or other labor dispute involving a work stoppage of workers will not constitute a ground for deportation, and alien who violates his or her status or who remains in the United States after his or her authorized period of stay has expired will be subject to deportation.

(15) Use of approval notice, Form I-797. The Service shall notify the petitioner of Form I-797 whenever a visa petition or an extension of a visa petition is approved under the O classification. The beneficiary of an O petition who does not require a nonimmigrant visa may present a copy of the approval notice at a Port-of-Entry to facilitate entry into the United States. A beneficiary who is required to present a visa for admission, and who visa will have expired before the date of his or her intended return, may use Form I-797 to apply for a new or revalidated visa during the validity period of the petition. A copy of Form I-797 shall be retained by the beneficiary and presented during the validity of the petition when reentering the United States to resume the same employment with the same petitioner.

(16) Return transportation requirement. In the case of an alien who enters the United States under section 101(a)(15)(O) of the Act and whose employment terminates for reasons other than voluntary resignation, the employer whose offer of employment formed the basis of such nonimmigrant status and the petitioner are jointly and severally liable for the reasonable cost of return transportation of the alien abroad. For the purposes of this paragraph, the term "abroad" means the alien's last place of residence prior to his or her entry into the United States.

# APPENDIX B



1 of 1 DOCUMENT

NEW YORK CONSOLIDATED LAW SERVICE
Copyright © 2014 Matthew Bender, Inc.
a member of the LexisNexis (TM) Group
All rights reserved

*** This section is current through 2014 released chapters 1-402 ***

EDUCATION LAW
TITLE VIII. THE PROFESSIONS
ARTICLE 131. MEDICINE

**Go to the New York Code Archive Directory**

*NY CLS Educ § 6524 (2014)*

§ 6524. Requirements for a professional license

To qualify for a license as a physician, an applicant shall fulfill the following requirements:

(1) Application: file an application with the department;

(2) Education: have received an education, including a degree of doctor of medicine, "M.D.", or doctor of osteopathy, "D.O.", or equivalent degree in accordance with the commissioner's regulations;

(3) Experience: have experience satisfactory to the board and in accordance with the commissioner's regulations;

(4) Examination: pass an examination satisfactory to the board and in accordance with the commissioner's regulations;

(5) Age: be at least twenty-one years of age; however, the commissioner may waive the age requirement for applicants who have attained the age of eighteen and will be in a residency program until the age of twenty-one;

(6) Citizenship or immigration status: be a United States citizen or an alien lawfully admitted for permanent residence in the United States; provided, however that the board of regents may grant a three year waiver for an alien physician to practice in an area which has been designated by the department as medically underserved, except that the board of regents may grant an additional extension not to exceed six years to an alien physician to enable him or her to secure citizenship or permanent resident status, provided such status is being actively pursued; and provided further that the board of regents may grant an additional three year waiver, and at its expiration, an extension for a period not to exceed six additional years, for the holder of an H-1b visa, an O-1 visa, or an equivalent or successor visa thereto;

(7) Character: be of good moral character as determined by the department; and

(8) Fees: pay a fee of two hundred sixty dollars to the department for admission to a department conducted examination and for an initial license, a fee of one hundred seventy-five dollars for each reexamination, a fee of one hundred thirty-five dollars for an initial license for persons not requiring admission to a department conducted examination, a fee of five hundred seventy dollars for any biennial registration period commencing August first, nineteen hundred ninety-six and thereafter. The comptroller is hereby authorized and directed to deposit the fee for each biennial registration period into the special revenue funds-other entitled "professional medical conduct account" for the purpose of offsetting any expenditures made pursuant to section two hundred thirty of the public health law in relation to the operation of the office of professional medical conduct within the department of health, provided that for each biennial registration fee paid by the licensee using a credit card, the amount of the administrative fee incurred by the department in processing

NY CLS Educ § 6524

such credit card transaction shall be deposited by the comptroller in the office of the professions account established by section ninety-seven-nnn of the state finance law. The amount of the funds expended as a result of such increase shall not be greater than such fees collected over the registration period.

(9) For every license or registration issued after the effective date of this subdivision, an additional fee of thirty dollars shall be paid and deposited in the special revenue fund entitled "the professional medical conduct account" for the purpose of offsetting any expenditures made pursuant to subdivision fifteen of section two hundred thirty of the public health law. The amount of such funds expended for such purpose shall not be greater than such additional fees collected over the licensure period or for the duration of such program if less than the licensure period.

(10) A physician shall not be required to pay any fee under this section if he or she certifies to the department that for the period of registration or licensure, he or she shall only practice medicine without compensation or the expectation or promise of compensation. The following shall not be considered compensation for the purposes of this subdivision: (a) nominal payment solely to enable the physician to be considered an employee of a health care provider, or (b) providing liability coverage to the physician relating to the services provided.

(11) No physician may be re-registered unless he or she, as part of the re-registration application, includes an attestation made under penalty of perjury, in a form prescribed by the commissioner, that he or she has, within the six months prior to submission of the re-registration application, updated his or her physician profile in accordance with subdivision four of section twenty-nine hundred ninety-five-a of the public health law.

## HISTORY:

Add, L 1971, ch 987, § 2, eff Sept 1, 1971.

Sub (5), amd, L 1995, ch 328, § 1, eff July 28, 1995.

Sub (6), amd, L 1982, ch 133, § 8, L 1992, ch 571, § 1, L 1999, ch 69, § 1, L 2001, ch 109, § 1, eff July 25, 2001.

Sub 6, amd, L 2008, ch 379, § 1, eff July 21, 2008.

Sub (8), amd, L 1976, ch 77, § 5, L 1982, ch 55, § 48, L 1987, ch 43, § 6 (see 1987 note below), L 1989, ch 62, § 18 (see 1989 note below), L 1990, ch 190, § 278, L 1996, ch 474, § 249, eff Aug 8, 1996 (see 1996 note below).

Sub (8), amd, L 2008, ch 57, § 1 (Part G), eff April 23, 2008, deemed eff on and after April 1, 2008.

Sub (9), add, L 1989, ch 61, § 266, eff April 19, 1989.

Former sub (9), add, L 1984, ch 582, § 1; repealed, L 1989, ch 61, § 266, eff April 19, 1989.

Sub (10), add, L 2002, ch 475, § 1, eff Aug 20, 2002.

Former sub (10), add, L 1990, ch 190, § 279; repealed, L 1996, ch 474, § 250, eff Aug 8, 1996 (see 1996 note below).

Previous sub (10), add, L 1985, ch 294, § 13; repealed, L 1990, ch 190, § 279, eff May 25, 1990.

Sub 11, add, L 2008, ch 477, § 22, eff Jan 1, 2009.

## NOTES:

Editor's Notes

Laws 1987, ch 43, §§ 61, 62, provide as follows:

§ 61. Registration fees paid pursuant to subdivision eight of section sixty-five hundred twenty-four and subdivision three of section sixty-five hundred forty-one of the education law and fines imposed pursuant to section sixty-five hundred eleven of such law in cases involving physicians, specialist's assistants, and physician's assistants shall be collected by the department of education and deposited to the professional medical conduct account.

§ 62. This act shall take effect May first, nineteen hundred eighty-seven and shall apply to fees received on or after that date.

Laws 1989, ch 62, § 101(c), eff April 19, 1989, provides as follows:

(c) Sections fifteen through sixty-five of this act shall apply to fees received on or after such effective date.

NY CLS Educ § 6524

Laws 1996, ch 474, § 268(32)(e), (f), (g) and (l), eff Aug 8, 1996, provides as follows:

§ 268. This act shall take effect immediately and sections one through one hundred seventy-seven shall be deemed to have been in full force and effect on and after July 1, 1996, except that:

(e) notwithstanding any inconsistent provision of the state administrative procedure act or any other provision of law, the commissioners of social services and health and any appropriate council is authorized to adopt or amend or promulgate on an emergency basis any regulation he or she or such council determines necessary to implement any provision of sections one hundred eighty-nine through two hundred sixty of this act on its effective date;

(f) the commissioners of social services and health and any appropriate council may take any steps necessary to implement sections one hundred eighty-nine through two hundred sixty of this act prior to its effective date;

(g) the provisions of sections one hundred eighty-nine through two hundred sixty of this act shall become effective notwithstanding the failure of the commissioners of social services and health or any council to adopt or amend or promulgate regulations implementing such sections;

(l) nothing contained herein shall be deemed to affect the application, qualification, expiration, reversion or repeal of any provision of law amended by sections one hundred eighty-nine through two hundred sixty of this act and such provisions of this act shall be applied or qualified or shall expire or revert or be deemed repealed in the same manner, to the same extent and on the same date as the case may be as otherwise provided by law.

New York References:
This section referred to in §§ 6528, 6529
State board for professional medical conduct; proceedings, CLS *Pub Health § 230*

NYCRR References:
Committee on the Professions. *8 NYCRR §§ 24.1 et seq*

Research References & Practice Aids:
*61 Am Jur 2d, Physicians, Surgeons, and Other Healers §§ 18, 19*
19B Am Jur Pl & Pr Forms (Rev ed), Physicians, Surgeons, and Other Healers, Forms 102, 103

Matthew Bender's New York Practice Guides:
1 *New York Practice Guide: Business and Commercial §§ 5.01, 5.28*

Law Reviews:
Quirin, Physician licensing and educational obsolescence: a medical-legal dilemma. *36 Albany L Rev 503*

**LexisNexis 50 State Surveys, Legislation & Regulations**
Physician Licensing & Continuing Education

Case Notes: 1. In general 2. Physician registration 3--5. [Reserved for future use] 6. Under former § 6502 [qualification for practice] 7. Under former § 6509 [license]

1. In general

# APPENDIX C



EPSTEIN
BECKER
GREEN

Attorneys at Law

John F. Fullerton III
t 212.351.4580
f 212.878.8600
jfullerton@ebglaw.com

June 18, 2014

**VIA EMAIL**

Ann Macadangdang, Esq.
Serrins & Fisher LLP
The Woolworth Building
233 Broadway, Suite 2340
New York, New York

      Re:   Talwar v. Staten Island University Hospital et al. 14-1520

Dear Ann:

      I write to confirm that Defendants will refrain from filing a motion to the District Court under Fed. R. Civ. P. 60(a) to correct the Judgment and a motion to the Second Circuit to dismiss the appeal without prejudice while the Rule 60(a) motion is pending. We continue to maintain that that is the appropriate procedural course of action for addressing what we believe was an oversight on the part of Chief Judge Amon with respect to denying supplemental jurisdiction over the state and city law claims once summary judgment was granted with respect to the federal claims, notwithstanding that Plaintiff had also pled and adduced facts to support the existence of diversity jurisdiction. We believe that the Second Circuit would prefer that the parties address the issue in this manner, and do not share your confidence that the Second Circuit will review the state and city law claims on the merits rather than remanding to the District Court for a decision in the first instance. Because, however, you have indicated that Plaintiff will not join and would, in fact, affirmatively oppose Defendants' proposed course of action, Defendants have decided not to make the motions, without waiver of or prejudice to their position or any arguments regarding this issue before either the Second Circuit or the District Court.

      Very truly yours,

      John F. Fullerton III